[Civ. No. 55884. Second Dist., Div. Five. Apr. 30, 1980.]

RAUL M. MARTINEZ-FERRER et al., Plaintiffs and Appellants, v. RICHARDSON-MERRELL, INC., et al., Defendants and Appellants.

COUNSEL

Allard, Shelton & O'Connor, Paul M. Mahoney and Ferdinand F. Fernandez for Plaintiffs and Appellants.

Fred B. Belanger, Schell & Delamer and Edward J. Horowitz for Defendants and Appellants.

OPINION

**KAUS, P. J.**—This is an appeal from a judgment for defendants after their motion for summary judgment against plaintiff Raul Martinez-Ferrer (Raul) was granted. Defendants cross appeal from the granting of plaintiff Nancy Martinez' (Nancy) motion for new trial.

Plaintiffs' first amended complaint alleged causes of action[1] arising from personal injuries—cataracts—resulting from Raul's ingestion of the drug MER/29 which was manufactured and distributed by defendant Richardson-Merrell and provided to Raul by Richardson-Merrell's salesman, defendant Leo Spengler. In the complaint, Nancy, Raul's wife, also alleged partial loss of consortium as a result of those same injuries. Defendants' successful motion for summary judgment was based solely on the ground that the actions were barred by the one-year statute of limitation (Code Civ. Proc., § 340, subd. 3.) Nancy's motion for new trial was granted for technical reasons which, in view of our ruling concerning Raul, will become irrelevant.

In support of their motion for summary judgment, defendants relied mainly upon Raul's deposition testimony. In that proceeding, Raul testified that he was a physician and surgeon who had been practicing in California since 1959. In 1960, he was suffering from a high cholesterol condition. Having read some of Richardson-Merrell's advertising promoting its anticholesterol drug MER/29, and after a "hallway consultation" with a doctor acquaintance, Raul prescribed MER/29 for himself and began taking the drug in about March of 1960.

On September 23, 1960, Raul suddenly discovered that he was unable to read. On that date he went to ophthalmologist Leonard Rifkin.

---

[1]Plaintiffs stated various theories of recovery: strict liability, negligence, breach of warranty, negligent failure to warn, and fraudulent misrepresentation of safety.

Doctor Rifkin examined his eyes and discussed possible causes of the problem. Raul suggested a chemical cause, speculating that "maybe the MER/29 breaks the pre-cholesterol earlier than it should be." Doctor Rifkin told him to stop taking all medications[2] and arranged for photographs to be taken of the interiors of his eyes. The photographs revealed macula edema—a swelling of a portion of the retina—and Doctor Rifkin diagnosed the condition as an "acute allergic reaction" of the backs of the eyes. Other eye specialists concurred in the diagnosis. Although at the time there was no known history of MER/29 producing eye problems, Raul and his doctors "assumed" that the cause of his condition was the medication; he was told to stop taking both MER/29 and the vitamins "just in case...."

A few weeks after the eye problems started, Raul developed a severe case of dermatitis which covered his entire body. His doctor concluded that the "likely cause" was MER/29.

During the period when he was suffering from these problems, Raul did not work for four to six weeks. The dermatitis cleared up in four or five months and, although some retinal scarring remained, his eyes got better "as the time passed." His vision was "poor," but he had worn eyeglasses since 1946 and he was able to resume his practice as a doctor.

Raul continued to have his eyes examined every two to three years and no further problems were found until 1976. In February 1976, opacities, or cataracts, were discovered in the capsules of his eyes. The cataracts were a permanent condition which created tunnel vision and interfered with Raul's ability to perform surgery. Raul anticipated that he "would not be able to see for too long." Dr. Rifkin determined that the cataracts were not "senile in character" but had been caused by MER/29. It should be stressed that the record contains no suggestion that the cataracts were wholly or partly the result of the 1960 retinal swelling—the macula edema.

Defendants also presented evidence that on December 1, 1961, Richardson-Merrell had sent a letter to all doctors in the United States warning them that a "few serious clinical injuries" had been reported in patients who had received MER/29. The letter specifically mentioned cataracts and icthyosis—a form of dermatitis—as having been reported, although it concluded that "[t]he side effects of all types reported to

[2]The only substances Raul was taking at the time were vitamins and MER/29. He discontinued the use of both immediately.

us to date total substantially less than one percent of the patients treated."[3] In his declaration in opposition to the motion for a summary judgment Raul states: "I did not read any of the literature referred to in [plaintiffs' counsels'] declaration regarding MER/29 causing cataracts, since I did not, to my knowledge, have cataracts."[4]

In opposition to defendants' motion for summary judgment, Raul declared that he had suffered "no permanent damage or injury" as a result of the 1960 problems and consequently "there was no point in bringing a lawsuit" at that time. He had "no idea" that he was developing cataracts until early in 1976.

Raul also presented a declaration by Doctor Rifkin, who stated that about six weeks after the onset of his 1960 eye problems, Raul's vision was "fully restored." Intermittent examinations between 1961 and 1975 revealed no sign of cataracts. Rifkin's suggestion in 1960 that Raul's macula edema had been caused by MER/29 was "merely a guess" on his part. All of the current eye problems, however, were due to the cataracts.

Jerome Bettman, M.D., an ophthalmologist with expertise in the etiology of cataracts—particularly as caused by MER/29—declared that he was aware of "no scientific or medical data" in existence from 1960 to 1978 which "even suggest[ed]" that MER 29 could cause macula edema.

In granting defendants' motion for summary judgment, the court necessarily determined that the statute of limitations had run when Raul filed his complaint on June 24, 1976.

██   While Raul presents various arguments which, if correct, would lead to a reversal, his first and dispositive point is this: however certain he may have been, in 1960, that his then troubles—the dermatitis and the macula edema—were caused by MER/29, if, in fact, that was not the case, no statute of limitations would have started to run. To put the

---

[3]MER/29 was taken off the market in April 1962. Thousands of users had been injured. The massive criminal and civil litigation which ensued is recounted in Rheingold, *The MER/29 Story—An Instance of Successful Mass Disaster Litigation* (1968) 56 Cal.L.Rev. 116.

[4]The phrasing of Raul's denial makes it difficult to escape the conclusion that before deciding not to read the letter, he peeked. It is, however, true that it is a red herring what Raul did or did not know or suspect about cataracts in 1961. He did not become afflicted for 15 years.

issue differently: unless the record demonstrates without substantial conflict that Raul would have had a case had he sued two decades ago, the summary judgment cannot stand; the first prerequisite for the running of the statute of limitations against a cause of action is the existence of such a cause.

Defendants deny this self-evident proposition and claim that the statute started to run when plaintiff knew or should have known that he had suffered injury as the *probable* result of MER/29, whether or not his actual or constructive knowledge was correct. In support of this thesis defendants cite *Gray v. Reeves* (1977) 76 Cal.App.3d 567, 577 [142 Cal.Rptr. 716]. In that case the plaintiff claimed that a drug called prednisone which he had started to take in 1968 had caused a degeneration of his hip socket. Corrective surgery was performed in 1971. Suit was not filed until 1973. The court held that the statute of limitations had run as a matter of law because the cause of the injury had been explained to plaintiff no later than January 1971, when "he clearly understood the drug prednisone *had probably caused the problem.*" (Italics added.) Defendants fasten onto the word "probably" as proof that their motion for summary judgment was properly granted even if it was not established that the 1960 eye or skin conditions were caused by MER/29; but the trouble with *Gray* and several other cases cited by defendants is simply that in none was there any factual issue concerning the etiology of the injury or disease which first put the various plaintiffs on notice: in each case the cause was at least assumed to be precisely the one for which the plaintiffs later sought recovery. Thus, for example, in *Gray* it was never claimed that the plaintiff's difficulties were not caused by prednisone. The only question was when he knew or should have known it. Our case is quite different: Raul makes no claim that his 1960 problems were caused by MER/29 and unless the record establishes without substantial contradiction that they were, the summary judgment must be reversed whatever Raul knew or, rather, thought he knew at the time.

It is clear to us that the record does not compel a finding that the 1960 symptoms were caused by MER/29. We have noted the Rifkin and Bettman declarations concerning the macula edema and the asserted lack of any scientific data which even suggested a connection with MER/29. As far as the dermatitis is concerned, the record is vaguer, probably because the parties thought it of lesser importance. In any event, basically we have nothing more than plaintiff's deposition

testimony that his treating dermatologist thought the dermatitis was "an allergic reaction, due to a known cause, very likely MER/29." Earlier he had told plaintiff that there was "nothing in the literature that will clear cut establish that it is due to the MER/29." Certainly these bits and pieces do not establish the cause of the dermatitis with the certainty required for a motion for summary judgment.[5]

Thus, while for reasons rooted in the nature of summary judgments plaintiff is entitled to a reversal, we appreciate that we have not even begun to decide the real issue on this appeal. The plain fact is that any realistic assessment of the record compels the conclusion that at the trial it will be found that MER/29 did cause at least some of Raul's 1960 problems—most likely dermatitis.  ■  The real question for the trial court will therefore be whether Raul can proceed against defendants on the theory that his cataracts were caused by MER/29, even though his action was filed years after he knew or should have known that he had suffered some bodily injuries from that product.[6]

The basis for defendants' negative answer to this question rests on the theory that Raul's ingestion of MER/29 triggered but one cause of action for personal injuries, known or unknown, latent or patent, temporary or permanent: Raul's cataracts are just a part of that cause of action which outlawed one year after his discovery that MER/29 had caused substantial bodily harm. Any other holding would permit Raul to split his cause of action.

---

[5]At various points in their briefs plaintiffs maintain that defendants deny that MER/29 caused Raul's dermatitis and macula edema. While, frankly, we have been unable to find any such denial in the record, defendants certainly made no affirmative effort to prove that Raul's 1960 problems were caused by their product.

At this stage of the litigation it is immaterial whether at the trial of the statute of limitation issue it will be plaintiff's burden to prove that his 1960 problems were not caused by MER/29 or whether defendants, as part of their burden with respect to the affirmative defense of the statute of limitations, will have to prove the opposite. (*Barnes v. Blue Haven Pools* (1969) 1 Cal.App.3d 123, 127 [81 Cal.Rptr. 444]; see also *Segura v. Brundage* (1979) 91 Cal.App.3d 19, 28-29 [153 Cal.Rptr. 777].)

[6]There is no dispute that the commencement of the period of limitations is governed by the so-called "discovery" standard. (*G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 25 [122 Cal.Rptr. 218]; *Warrington* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 564, 566 [80 Cal.Rptr. 130]; *Howe* v. *Pioneer Mfg. Co.* (1968) 262 Cal.App.2d 330, 339 [68 Cal.Rptr. 617].) We note for the record that Raul does not admit the requisite discovery in the early sixties. We shall, however, assume for the sake of argument that more than one year before this action was filed, Raul discovered the connection between MER/29 and his 1960 complaints.

Of the many cases cited by defendants, factually the closest perhaps is *Calvin* v. *Thayer* (1957) 150 Cal.App.2d 610 [310 P.2d 59]. There an action for medical malpractice had been filed on January 28, 1954. The trial court found that plaintiffs had discovered the malpractice on January 20, 1953. On appeal plaintiffs apparently argued that their knowledge that the injuries were permanent rather than temporary was acquired less than one year before January 24, 1954. The court dealt with this contention as follows: "With respect to plaintiffs' knowledge of the extent of Mrs. Calvin's injuries, both temporary and permanent, plaintiffs argue that they have one cause of action for the injuries which they considered to be temporary and another cause of action for the permanent injuries. The argument has no support in reason or authority. Mr. and Mrs. Calvin had, severally, a single cause of action for his or her damages. Any recovery would have included compensation for damages sustained to the time of trial and also for future detriment that could be established as the reasonably probable consequence of the injury." (*Id.*, at p. 616.)

*Calvin* demonstrates both the strength and the weakness of defendants' position. Its strength is, simply, that it is rooted in the traditional concept of what constitutes a cause of action for personal injuries. Thus, in *Sonbergh* v. *MacQuarrie* (1952) 112 Cal.App.2d 771, 773-774 [247 P.2d 133] the court quotes with approval from 34 American Jurisprudence 126, section 160: "As a general rule, where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. *It is not material that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date. . . .*" (Italics added.)

*Calvin* also illustrates, however, the injustice of the general rule if applied to the facts of this case. The *Calvin* court said confidently that "[a]ny recovery would have included compensation for damages sustained to the time of trial *and also for future detriment that could be established as the reasonably probable consequence of the injury.*" (Italics added.) The sad fact is that Raul would have been laughed out of court had he sued for his dermatitis and macula edema when defendants say he should have—say in 1962—and had he then attempted to be compensated for the speculative possibility that his 1960 ingestion of MER/29 might cause cataracts before that chance became a fact in

1976. On the other hand, under our statutory scheme (Code Civ. Proc., § 583) Raul would have been quite unable to keep his action alive for a decade and a half. The simple fact is that rules developed against the relatively unsophisticated backdrops of barroom brawls, intersection collisions and slips and falls lose some of their relevance in these days of miracle drugs with their wondrous, unintended, unanticipated and frequently long-delayed side effects.

As the Supreme Court recently said in a case involving such a drug—though, to be sure, a different legal problem—"[t]he response of the courts [to advances in science and technology] can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs." (*Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, 610 [163 Cal.Rptr. 132, 607 P.2d 924].)

*Sindell* involved a drug which, according to the allegations of the complaint, caused cancer in the daughters of women who had taken the drug during pregnancy. The cancer manifested itself after a minimum latent period of 10 to 12 years. No one, however, raised any issue concerning the statute of limitations presumably in part because the victims did not suffer earlier minor side effects which might have triggered the running of the statutory period. In any event, what the alleged facts in *Sindell* and in this case clearly confirm is that rules defining a cause of action for personal injuries in cases involving straightforward trauma do not necessarily fit all cases in an age where defendants market products such as MER/29, designed to alleviate human suffering in one form or another but which, years and even decades later cause serious disabling or even life-threatening injuries. If the manufacturer of such a drug is liable for the long-delayed effects of his product, it advances no coherent public policy to absolve him of that liability simply because right after the ingestion of the drug the user suffered other, different, independent and relatively innocuous side effects for which he did not bother to sue.[7]

---

[7]The result we reach is in no way based upon the fact that Raul forbore filing suit in the early sixties. If we are right in our ultimate conclusion that the present suit for damages for the cataracts does not involve an impermissible splitting of a cause of action, it is immaterial whether or not Raul recovered an earlier judgment for the sequelae other than the cataracts. The issue with which we are wrestling would then simply be presented in a different guise; the question would not be whether the statute of limitations had run on the cause of action, but whether or not the doctrine of merger prevented the present litigation. (See 4 Witkin, Cal. Procedure (2d ed. 1971) § 190, p. 3331.)

*Davies* v. *Krasna* (1975) 14 Cal.3d 502, 512-514 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807] contains one of the Supreme Court's most recent explications of the purpose and rationale behind statutes of limitations. Said the court: "The fundamental purpose of such statutes is to protect potential defendants by affording them an opportunity to gather evidence while facts are still fresh. [Citations.] Modern adjustments in limitations law, however, have reflected concern for the practical needs of prospective plaintiffs. Our law has evolved, for example, to a point where the limitations clock only begins to run on certain causes of action where the injured party discovers or should have discovered the facts supporting liability. [Citations.]"

Although obviously not written with this case in mind, this paragraph can serve as an authoritative justification for permitting Raul to proceed. The cataract-causing potential of MER/29 became known to defendants in 1960 or 1961. They obviously have had an opportunity to gather evidence on the subject while the facts were as fresh as they could be. In addition, they have had two decades to refine the result of their researches.[8] On the other hand, as far as the "practical needs" of Raul, the prospective plaintiff, are concerned, his body was the situs in which, unknown to him, the germ planted in 1960 developed for 16 years during which he was, however, legally impotent to seek redress. As *Davies* also recognizes, "we generally now subscribe to the view that the period cannot run before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages."

All of this is, of course, perfectly straightforward and there would not be the slightest difficulty in saying that Raul's cause of action is not barred by the statute of limitations, were it not again for the relatively minor problems encountered in 1960. Raul now wants us to hold that they were so minimal that they did not trigger the running of any cause of action at all. Unfortunately, however, the facts will not permit us to agree. In 1960 Raul obviously suffered substantial damages, including a substantial loss of earnings. If he is to prevail, it cannot be on the basis of wishing away the past.

---

[8]And, incidentally, to mitigate the damage by publicity, follow-up examinations and other procedures designed to prevent, minimize or even cure the harm caused by the rogue drug. (Cf., *Dujardin* v. *Ventura County Gen. Hosp.* (1977) 69 Cal.App.3d 350, 354 [138 Cal.Rptr. 20].)

The fact is that Raul is caught in a classical dilemma: whether a useful rule of law—here the prohibition against splitting causes of action—is to be enforced even in situations where it would lead to injustice, or whether the situation that confronts the court is sufficiently distinguishable that a just result can be reached without doing violence to the essence and purpose of the general rule.

We think we have already demonstrated that permitting Raul to proceed advances, rather than hinders, the policies which support the statute of limitations in general, as explained in *Davies* v. *Krasna, supra,* 14 Cal.3d 502. Turning more specifically to the rule against splitting causes of action we perceive a trend away from an unthinking enforcement of the rules. Three developments are illustrative:

First we point to the special rules which have developed around the statute of limitations in nuisance cases. There, in a doubtful case as to whether or not the nuisance is permanent or temporary, the plaintiff has an election to treat the condition as one or the other, without being met by a plea of merger if he has treated what is, in fact, a permanent nuisance as a temporary one for the maintenance of which successive actions can be brought. (*Spaulding* v. *Cameron* (1952) 38 Cal.2d 265, 268 [239 P.2d 625]; see also *Phillips* v. *City of Pasadena* (1945) 27 Cal.2d 104, 107-108 [162 P.2d 625]; *Kafka* v. *Bosio* (1923) 191 Cal. 746, 752 [218 P. 753, 29 A.L.R. 833].) Minimally the nuisance cases exemplify some recognition that under certain circumstances a plaintiff need not put all of his eggs in one basket, particularly when he does not know how many eggs he has and their eventual number is beyond his control.[9]

Another group of cases difficult to reconcile with the strict rule contended for by defendants is the one involving progressive occupational diseases such as silicosis or dermatitis due to constant skin contact with some chemical substance. The latter was the case in *Coots* v. *Southern Pacific Co.* (1958) 49 Cal.2d 805 [322 P.2d 460], where the plaintiff knew everything there was to know to file a suit as early as July 1949. A three-year statute of limitations governed the action under the Federal Employers' Liability Act. Suit was filed on October 11, 1954. The

---

[9]For the proposition that the nuisance rules apply not only to invasions of property interests, but also to personal injuries, see *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 937-938 [101 Cal.Rptr. 568, 496 P.2d 480].

Supreme Court held that the suit was timely because the condition did not become "real worse" until 1953. (Cf., *Marsh v. Industrial Acc. Comm.* (1933) 217 Cal. 338, 351 [18 P.2d 933, 86 A.L.R. 563].)

The final straw in the wind is the substantial relaxation of the rigors of the merger aspect of res judicata embodied in the tentative draft of the Restatement Second of Judgments. The relevant section is 61.2 which purports to list seven groups of exceptions to the general rule against splitting causes of action. Though probably not written with a case such as ours in mind, we merely note that the majority find no counterpart in the original Restatement. Thus, under section 61.2 the general rules of merger would not apply if "[i]t is clearly and convincingly shown that the policies favoring preclusion of a second action are overcome *for an extraordinary reason....*" or "[t]he judgment in the first action was plainly inconsistent with the *fair and equitable implementation of a statutory or constitutional scheme....*" (Italics added.) Raul's situation fits comfortably into both exceptions.

These developments—the nuisance cases, the progressive disease situations and the growing number of recognized exceptions to the rule of merger do not compel a holding for Raul, but they certainly are straws which indicate which way the wind is blowing: away from a blind adherence to rigid concepts of what constitutes a cause of action and toward a set of rules which will enable plaintiffs to recover for just claims where that is possible without prejudice to defendants or insult to established rules of law, such as the merger aspect of the rule of res judicata. We make no attempt to even summarize where all this may lead. We are, however, convinced that under the peculiar circumstances of this case it would be a miscarriage of justice not to permit plaintiff to go to trial.

As previously noted, defendants have cross-appealed from the plaintiff Nancy Martinez' successful motion for a new trial. Nancy had sued for loss of consortium. After the court granted defendant's motion for a summary judgment against her, it reversed itself for technical reasons. In the context of having granted defendant's motion for a summary judgment against Raul, the court may have been mistaken. Since, however, the summary judgment against Raul must be reversed, the order granting Nancy a new trial must obviously stand.

The judgment in favor of defendants and against the plaintiff Raul M. Martinez-Ferrer is reversed. The order granting a new trial to the plaintiff Nancy Martinez is affirmed. All costs on appeal are awarded to plaintiffs.

Stephens, J., and Ashby, J., concurred.