**Annette T. NEW, Plaintiff–Appellant,**

**v.**

**ARMOUR PHARMACEUTICAL COMPANY, Defendant–Appellee.**

**No. 93–56023.**

United States Court of Appeals, Ninth Circuit.

Argued and Submission Deferred Feb. 7, 1995.

Resubmitted Feb. 21, 1995.

Decided June 22, 1995.

---

**3.** We also deny the appellees' request for attorneys' fees on appeal pursuant to 42 U.S.C. § 2000e–5(k).

Phillip K. Fife, Seal Beach, CA, for plaintiff-appellant.

Lori Huff Dillman, Jefferson K. Logan, Thomas H. Keeling, Sidley & Austin, Los Angeles, CA, and Sara J. Gourley, Chicago, IL, for defendant-appellee.

Before: FERGUSON, BEEZER and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Annette T. New, the successor in interest of Joseph J. New, (New), deceased, appeals from the judgment of the district court dismissing New's action against Armour Pharmaceutical Company (Armour). The single issue on appeal is when the California statute of limitations begins to run on causes of action for the wrongful infliction of AIDS. Holding that the issue cannot be decided on the pleadings, we return the case to the district court.

## PROCEEDINGS

On January 19, 1993, New, a citizen of California, filed suit against Armour in Los Angeles County Superior Court. Armour, a Delaware corporation, removed the case to the federal district court on the ground of diversity of citizenship. New alleged the following:

New was born October 22, 1935. In his sixth year he experienced episodes of abnormal bleeding, and in 1961 he was diagnosed as a Type A hemophiliac; he was thereafter successfully treated with blood-coagulating products.

Armour and three other companies were manufacturers and marketers of an agent for the treatment of Type A hemophilia known generically as Factor VIII. Factor VIII is a concentrated, freeze-dried form of coagulating human blood protein and is manufactured from pooled donations of human blood plasma obtained, for a given manufacturing lot, from as many as 20,000 donors. It was marketed for use of patients in a hospital environment, in a physician's office, or in a home care program as an effective product for treatment of Type A hemophilia. New was treated with Factor VIII produced by Armour on May 10, 1981, July 3, 1983, March 3, 1984, and June 3, 1984.

In 1988 New, on the advice of his physician, underwent tests to determine if there was present in his blood antibodies believed to indicate the presence of the Human Immunodeficiency Virus (HIV). New tested positive.

On information and belief, New further alleged that as early as July 1982, and no later than mid–January 1983, Armour and the three other manufacturers had reason to know that they were collecting blood plasma for Factor VIII from donors who were representative of the population groups known to exhibit high risk for Acquired Immunodeficiency Syndrome (AIDS); that users of Factor VIII had developed AIDS under circumstances not involving on their part any of the other forms of human activity suspected of being involved in the transmission of AIDS; that the agency for transmitting AIDS was blood-borne and probably a virus; that such agent appeared to be capable of surviving the manufacturing process by which Factor VIII was made; that a reliable and inexpensive test existed for detecting Hepatitis B virus in humans and that there was a high degree of correlation between infection with this virus and infection with AIDS so that blood donors with AIDS could be screened out; and that prior to July 1983 Armour and the other manufacturers had sufficient information to warn physicians, pharmacists, hospitals and other purchasers of Factor VIII of the risk of contamination, but that no physician or health care professional treating New informed him prior to 1985 of such risk and that he is informed and believes that Armour did not communicate such information or provide any warnings to physicians who treated him prior to late 1984. He further alleged that he learned most of what he knows about the risk of the contamination of Factor VIII by HIV within the past year. If he had been aware of the information he would not have consented to infusions of Factor VIII between July 1, 1983 and June 30, 1984 but would have used other means of treating his hemophilia involving a lower risk of transmission of HIV. During this period he became infected with HIV through infusion of Factor VIII.

New further alleged that infection with HIV "leads almost invariably" to the development of AIDS, itself "almost invariably a terminal disease" within an average of eleven years from the time of infection with HIV. He recited a number of facts occurring "within" the year preceding the filing of his complaint that indicated serious deterioration of his health, and he noted that on January 17, 1992 he had stopped work "as the result of the progressive effect of these conditions." He died after the decision of the district court and prior to the argument of this appeal.

The complaint set out the following causes of action: (1) negligent failure of Armour to warn about the risk of HIV in Factor VIII; (2) negligent manufacture of Factor VIII by Armour and failure to adequately screen and test blood donors; (3) negligent failure to timely implement heat treatment of Factor VIII; (4) negligent failure to recall contaminated Factor VIII already in the hands of physicians; (5) conspiracy with the other manufacturers of Factor VIII to conceal the risk of contamination and to avoid recall of the dangerous product; (6) intentional failure by Armour to warn; (7) intentional failure to screen and test; (8) intentional failure to heat treat the product; and (9) intentional failure to recall Factor VIII.

Armour moved to dismiss under Federal Rule of Civil Procedure 12(b) on the grounds that New's complaint was barred by the one-year statute of limitations set out in California Code of Civil Procedure § 340(3) and, to the extent applicable, § 338(d). Noting that New tested positive in 1988, the district court held: "When plaintiff tested positive for HIV ... he knew of his infection with HIV and suspected or should have suspected that his infection was caused by something done wrong to him. Such knowledge, especially when combined with the fact that the plaintiff's health further deteriorated more than a year before he filed his complaint as a result of the progressive impairment of his autoimmune system from his infection with HIV (Complaint at ¶ 24), is sufficient to start the statute running." The district court added that, since New could not amend his complaint "without contradicting the allegations in his original complaint which establish that the statute has run," his complaint must be dismissed with prejudice. On June 7, 1993, judgment was entered in favor of Armour, and Armour was given its costs. Appeal was taken.

## ANALYSIS

In a medical malpractice action against a hospital and blood bank for a transfusion with tainted blood, it was assumed *arguendo* that the plaintiff's injury was deemed to have occurred when a blood test revealed that he had HIV. *Katz v. Children's Hosp.,* 28 F.3d 1520, 1523–24 (9th Cir.1994); there was neither a holding nor even a discussion relating infection with HIV to AIDS. *Katz* does not help us here.

This case is controlled by California law as set out in *Jolly v. Eli Lilly & Co.,* 44 Cal.3d 1103, 245 Cal.Rptr. 658, 751 P.2d 923 (1988), understood in terms of its facts and the cases it cites with approval. In this authoritative exposition of the California approach to the statute of limitations governing personal injury torts, the Supreme Court of California said:

> In *Davies v. Krasna* (1975) 14 Cal.3d 502, 512 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807], we held that the fundamental purpose of the statute is to give defendants reasonable repose, that is, to protect parties from defending stale claims. A second policy underlying the statute is to require plaintiffs to diligently pursue their claims. Because a plaintiff is under a duty to reasonably investigate and because a suspicion of wrongdoing, coupled with a knowledge of the harm and its cause, will commence the limitations period, suits are not likely to be unreasonably delayed, and those failing to act with reasonable dispatch will be barred. At the same time, plaintiffs who file suit as soon as they have reason to believe that they are entitled to recourse will not be precluded. *Jolly,* 44 Cal.3d at 1111–12 [245 Cal.Rptr. 658, 751 P.2d 923] (emphasis omitted).

■ The purpose of the statute of limitations, formulated in *Davies,* 14 Cal.3d at 512, 121 Cal.Rptr. 705, 535 P.2d 1161, as being fundamentally "to protect potential defendants by affording them an opportunity to gather evidence while facts are still fresh," is here expanded with the second purpose of motivating plaintiffs to diligently pursue their claims. At the same time *Davies* is cited with approval and there is no repudiation of its statement of the California rule

that "the limitations clock only begins to run on certain causes of action when the injured party discovers or should have discovered the facts supporting liability", *id.,* and "that the period cannot run before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages." *Id.* at 513, 121 Cal.Rptr. 705, 535 P.2d 1161.

■ Expanding on *Davies, Jolly* identifies three elements which must be present before the statute starts to run: a suspicion of wrongdoing, a knowledge of the harm, and a knowledge of the cause of the harm such that the plaintiff believes he is entitled to recourse.

What is meant by "a suspicion of wrongdoing" is spelled out by *Jolly.* "Wrongdoing" is meant in the lay sense; it is not at all necessary that the plaintiff know that there is a legal wrong. *Jolly,* 44 Cal.3d at 1110, n. 7, 245 Cal.Rptr. 658, 751 P.2d 923. What is meant by "suspicion" is apparent from the facts of *Jolly.* The plaintiff in that case was born in 1951. In 1972 she learned that while she was in utero her mother had ingested DES for the prevention of miscarriage. She was told in 1972 that DES daughters could suffer injuries. She went to a DES clinic at the UCLA Medical Center for a checkup. She was diagnosed as having adenosis, a precancerous condition that required careful monitoring. In 1976 she had an abnormal pap smear and underwent surgery to remove abnormal tissue. In 1978 she underwent a complete hysterectomy. In the court's words, as of 1972 the plaintiff "was aware, or at least suspected, that her condition was a result of her mother's ingestion of DES during pregnancy." *Id.* at 1107, 245 Cal.Rptr. 658, 751 P.2d 923. In 1972 she attempted to discover the manufacturer of the DES. She increased her efforts in 1976 and 1978 when her condition "became acute." She did not actually bring suit against the manufacturers until *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980), held that a plaintiff unable to identify the particular manufacturer

of a fungible drug could join all the defendants who manufactured a substantial part of the market.

In *Jolly*, the defendant manufacturers opposed the plaintiff's suit, pleading the statute of limitations and contending that the statute began to run when the plaintiff knew of her injury and its factual cause, i.e. in 1972. The court declared that such a rule was "not the rule in California." *Jolly*, 44 Cal.3d at 1109, n. 4, 245 Cal.Rptr. 658, 751 P.2d 923. The court did not interpret the plaintiff's suspicion in 1972 as triggering a duty to bring suit, nor did the court treat the fact that by 1972 she had already suffered a harm, the infliction of adenosis, and that that harm would require further medical attention, as starting the running of the statute. Nor did the court focus on the development of her condition to an acute stage in 1976 requiring surgery as the suffering of a harm that began the running of the statute. Instead, the court found the statute began to run no later than 1978 when she underwent the complete hysterectomy and at that time, by her own admission, felt that someone had done a wrong to her for which she should be compensated. *Id.* at 1114, 245 Cal.Rptr. 658, 751 P.2d 923. In other words, suspicion that one has suffered a harm does not start the statute of limitations unless one is in possession of facts that establish both the nature of the harm and its probable cause; and the duty to investigate, insisted upon by the court, began four to six years after the plaintiff's strong suspicion about DES as the causal agent.

This teaching of *Jolly* is buttressed by its citation of two cases which the court declares "do no more than set out the discovery rule as previously described." *Id.* at 1110, n. 5, 245 Cal.Rptr. 658, 751 P.2d 923. These cases are *Whitfield v. Roth*, 10 Cal.3d 874, 112 Cal.Rptr. 540, 519 P.2d 588 (1974) and *Martinez–Ferrer v. Richardson–Merrell, Inc.*, 105 Cal.App.3d 316, 164 Cal.Rptr. 591 (1980). In *Whitfield*, the minor plaintiff was diagnosed in October 1963 as suffering from the psychiatric disorder of anorexia nervosa as the result of what might have been malpractice; her mother acted on her suspicion of the wrong by contacting attorneys to file a malpractice action and by writing a letter to

a newspaper chronicling her daughter's "sad medical history." *Whitfield*, 10 Cal.3d at 888, 112 Cal.Rptr. 540, 519 P.2d 588. In a subsequent suit for negligent treatment, the defendant contended that the statute had begun to run as of October 1963, a contention that would have barred the suit. It was, however, only in July 1964 that the plaintiff had been diagnosed as suffering from an organic disease, cranial pharyngioma. The statute was treated as running from the diagnosis of this more serious disease, even though it might have been detectable back in October 1963 when malpractice was first suspected.

In *Martinez–Ferrer*, the other case cited by *Jolly* as applying the normal discovery rule, the plaintiff, Raul Martinez–Ferrer, took the defendant's anticholesterol drug and several months later found himself unable to read; he was diagnosed as suffering from a swelling of the retinas. A few weeks later, he developed a severe case of dermatitis. He was unable to work for four to six weeks. The dermatitis cleared up in four or five months. His eyes gradually got better although his vision remained poor and there was some retinal scarring. Sixteen years later, in 1976, he suffered cataracts creating tunnel vision and preventing him from pursuing his profession as a surgeon. A physician diagnosed the cataracts as caused by the drug he had taken in 1960. He brought suit against the drug's manufacturer. The defendant sought summary judgment on the ground that the action was barred by the statute of limitations. The defendant presented evidence that in 1961 it had warned all doctors in the United States that the drug had caused a few serious injuries, especially dermatitis and cataracts, in less than 1% of the persons treated. The appellate court stated: "[t]he real question for the trial court will therefore be whether Raul can proceed against defendants on the theory that his cataracts were caused by MER/29, even though his action was filed years after he knew or should have known that he had suffered some bodily injuries from that product." *Id.* at 322, 164 Cal.Rptr. 591.

The court then interpreted *Davies* and its statement that the statute of limitations

starts only when the plaintiff "possesses a true cause of action," something beyond "merely a symbolic judgment such as an award of nominal damages," *Davies*, 14 Cal.3d at 513, 121 Cal.Rptr. 705. Interpreting this statement, Presiding Justice Otto Kaus concluded that *Davies* should not be applied literally; even though the plaintiff would have been able to get some damages in 1960, he "would have been laughed out of court" if he had attempted to be compensated in 1960 for the chance that he might develop cataracts in 1976. *Martinez–Ferrer*, 105 Cal.App.3d at 323–24, 164 Cal.Rptr. 591. Applying the California rule of discovery, the court held the plaintiff could sue in 1976 for the injuries inflicted in 1960 and latent since that date. The court noted that in doing so it was following the California pattern of recognizing that "miracle drugs with their wondrous, unintended, unanticipated and frequently long-delayed side effects" had to be approached differently from the torts occasioned by "barroom brawls, intersection collisions and slips and falls." *Id.* at 324, 164 Cal.Rptr. 591.

In the light of *Jolly v. Eli Lilly & Co.* and the cases it cites and approves—*Davies v. Krasna*, *Whitfield v. Roth*, and *Martinez– Ferrer v. Richardson–Merrell, Inc.*—the question in this case is when New had reason to believe he had a cause of action against Armour for the infliction of AIDS. To answer this inquiry we have only the dates furnished by New's complaint: in 1988 he tested positive for HIV and within the year preceding January 19, 1993 he suffered a serious decline in health, and on January 17, 1992 due to his declining health he gave up his employment.

■ We start with the contention that the statute expired sometime in 1989, one year after New tested positive. At that point he knew he had suffered something he had not sought. He could suspect that its cause was contaminated blood. He could suspect that the blood was contaminated by wrongdoing. He could suspect that the cause of the wrongdoing was the defendant. If he made the diligent inquiry prescribed by *Jolly*, 44 Cal.3d at 1112–13, 245 Cal.Rptr. 658, 751 P.2d 923, he would have discovered several

cases in which hemophiliacs were alleging that they had contracted AIDS or some "severe virus-type illness" by means of contaminated blood plasma. *Doe v. Travenol Laboratories, Inc.*, 698 F.Supp. 780 (D.Minn.1988); *Poole v. Alpha Therapeutic Corp.*, 698 F.Supp. 1367 (N.D.Ill.1988); *Jones v. Miles Laboratories, Inc.*, 705 F.Supp. 561 (N.D.Ga. 1987); *McKee v. Miles Laboratories, Inc.*, 675 F.Supp. 1060 (E.D.Ky.1987), *aff'd*, 866 F.2d 219 (6th Cir.1989); *Doe v. Miles Laboratories, Inc.*, 675 F.Supp. 1466 (D.Md.1987); *Coffee v. Cutter Biological*, 809 F.2d 191 (2nd Cir.1987); *Hyland Therapeutics v. Superior Court*, 175 Cal.App.3d 509, 220 Cal.Rptr. 590 (1985). None of these cases showed that the symptoms of HIV inevitably presaged AIDS.

When New tested positive in 1988, he was aware that he had HIV. He did not have AIDS. In his complaint New alleges that HIV almost inevitably leads to AIDS. That allegation represents present medical belief. It is not a statement of what New knew or believed or could have discovered in 1988. In 1988, New could not have known that he surely would get AIDS. Diligent as he might have been in discovering a possible wrong by Armour that had inflicted him with HIV, he could not have discovered with all the diligence in the world that Armour had inflicted him with AIDS.

What New would have discovered in 1988 as to the nature of his injury was that he had a condition which possibly but improbably might result at some future time in his having AIDS. On August 5, 1987, for example, a federal district court summarized "medical science as it now finds it" on the likelihood of three young boys, all moderate hemophiliacs and HIV–positive, developing AIDS. At the time of the court's opinion ninety-five percent of all severe hemophiliacs were testing positive for HIV, apparently because they all had been treated with Factor VIII. On the other hand, less that one per cent of the estimated 20,000 hemophiliacs in the United States had developed AIDS. The United States Public Health Service expected between twenty to thirty percent of the total seropositive population of the United States to develop AIDS by 1991. Hemophiliacs, however, were considered "less likely" to develop AIDS than

the general seropositive population. *Ray v. School District of Desoto County,* 666 F.Supp. 1524, 1530 (M.D.Fla.1987). As of that date the chances that a seropositive hemophiliac would develop AIDS must have been estimated at about one in four.

In the March–April 1988 issue of *Transfusion,* 28(2)98–102, researchers at Tulane, W. Anders, C. Daul, R. DeShazo, and C. Palmer, published "Seroconversion to Human Immunodeficiency Virus in Hemophiliacs." They reported that of 187 hemophiliacs studied for forty-five months, fifty-five per cent had HIV but of the total of 187 only four had developed AIDS, a percentage of under three percent of those who had been seropositive for nearly four years.

In January 1989, the National Hemophilia Foundation issued an "AIDS Update," a report based on the most current information available, prepared by Glenn F. Pierce, M.D., Ph.D. The report asked, "If I have HIV antibodies, does that mean I will definitely get AIDS?" The report answered, "No. The presence of the antibodies in the blood means that the person has been exposed to and infected with the virus at some time, NOT that the person has AIDS now or will develop AIDS. Many persons with hemophilia are now showing evidence of having developed antibodies to this virus. About 5–7% of those who have developed HIV antibodies have developed AIDS."

Because this case has been decided on the basis of pleadings in which 1988 has been treated as the year of New's discovery of his injury, we do not extend our survey of the literature beyond this year. The information available to New from the beginning of 1988 to the beginning of 1989 told him that the odds were substantial that he would not get AIDS. On the basis of this information, New could not have even brought a case for the emotional damage inflicted by a fear of the chance of the HIV turning into AIDS, *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993); *Kerins v. Hartley,* 33 Cal.Rptr.2d 172, 27 Cal.App.4th 1062 (1994). Like the plaintiffs in *Whitfield, Martinez–Ferrer,* and *Jolly* itself, New did not have a cause of action for serious illness when he was diagnosed with a condition that later medical knowledge determined would lead to the serious illness. The statute of limitations started to run only at the onset of the serious disease.

■ We turn back the complaint to determine that date and find an apparent contradiction exists in the complaint. On the one hand, the complaint alleges that the serious decline began *within* the year preceding the filing of the complaint. On the other hand, it alleges that he found it necessary to stop work on January 17, 1992 "as the result of the progressive effect of these conditions." The district court construed the latter statement as an admission that there had been a serious impairment of New's health prior to January 17, 1992, so that his filing on January 19, 1993 was too late. So construed, the complaint runs counter to its description of conditions alleged to have occurred only in the period January 17, 1992—January 19, 1993. So construed, the complaint is self-contradictory. The pleader has created an ambiguity fatal to his claim.

■ It is possible that the ambiguity might have been cleared up by amendment. As Armour's motion to dismiss was not a responsive pleading, New had the right to amend as a matter of course, Fed.R.Civ.P. 15(a), unless the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency. *Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). The district court, however, denied leave to amend on the ground that any amendment that preserved the action would contradict the original complaint. But it is possible that an amendment would merely remove the apparent contradiction that now exists in the complaint. Under our normal rule of liberally allowing a first amendment to a complaint, leave should have been given to amend to set out clearly the facts at New's disposal prior to the bringing of the suit.

■ Armour, noting that the complaint was filed on January 19, 1993, argues on this appeal that by New's own admission he missed the one-year statute of limitations by two days. Cal.Code Civil Proc. § 12, however, excludes from the computation of time the

452

first day and also excludes the last if it was a holiday. January 18, 1993 was Martin Luther King, Jr. Day. One year from January 17, 1992 was, accordingly, not up before January 19, 1993. The statutory time was not up.

Accordingly, we REVERSE and REMAND to the district court for proceedings consistent with this opinion.