**James Leroy JACKSON,**
**Plaintiff-Appellee,**

v.

**JOHNS–MANVILLE SALES CORPORA-**
**TION and Raybestos-Manhattan, Inc.,**
**Defendants-Appellants.**

No. 82–4288.

United States Court of Appeals,
Fifth Circuit.

March 23, 1984.

Opinion on Granting of Rehearing En
Banc July ·2, 1984.

---

508

Megehee, Brown, Williams & Mestayer, Roy C. Williams, Pascagoula, Miss., Lively M. Wilson, Dorothy J. Chambers, Louisville, Ky., William N. Reed, John H. Holloman,

III, Jackson, Miss., for defendants-appellants.

Richard F. Pate, Mobile, Ala., Cupit & Maxey, Danny E. Cupit, Jackson, Miss., Blatt & Fales, Ronald L. Motley, Barnwell, S.C., for plaintiff-appellee.

Before CLARK, Chief Judge, GARZA and JOLLY, Circuit Judges.

CLARK, Chief Judge:

Johns-Manville Sales Corporation (Johns-Manville) and Raybestos-Manhattan, Inc. appeal a jury verdict awarding actual and punitive damages to James Jackson, a former shipyard worker, in a strict liability action for injuries allegedly caused by the defendants' failures to warn of the hazards of exposure to their asbestos products. Finding that the trial court ruled correctly on Jackson's entitlement to a strict liability cause of action but erred in admitting evidence of the mere possibility of Jackson's developing cancer and in allowing punitive damages in this strict liability action, we affirm in part, reverse in part, and remand for a new trial.

## I. FACTS AND PROCEDURAL BACKGROUND

James Jackson began working at Ingalls Shipbuilding Corporation (Ingalls) in Pascagoula, Mississippi, in 1953, when he was about twenty-seven years old. He worked there until 1971, first as a sheet-metal mechanic and after 1957 as a work leaderman or supervisor. Jackson testified that he was exposed to asbestos dust every day for the full time of his employment at Ingalls.

As a mechanic, he installed sheet metal over ducts, shelves, pipes, boilers, and other such surfaces within ships under construction. Often these surfaces previously had been covered with asbestos insulation. To attach sheet metal, Jackson had to drill holes in the asbestos insulation. He testified that he also cut and dovetailed gaskets from asbestos material. Occasionally, he would cut asbestos cloth, three or four feet wide, with his pocket knife or shears in order to wrap and protect equipment around which he was working. He alleged that all these activities generated asbestos dust in the air.

Jackson testified that he worked alongside other craftsmen who made more direct and extensive use of asbestos products. He testified, for instance, that in lagging boilers, he worked alongside insulators who would first saw and tear blocks of asbestos, then rivet the asbestos to the boilers, all of which made the air "very dusty." He testified that when he worked in engine rooms, asbestos dust would fall upon him as insulator workmen above him on catwalks or temporary scaffolds cut and installed asbestos. Jackson testified that other workers generated asbestos dust in his work area when they dumped sacks of asbestos powder into mortar boxes and mixed the powder with water to create cement, or "mud." Workers also raised dust around him as they cut asbestos cloth to wrap pipes and other surfaces, and as they sawed prefabricated wall boards containing asbestos.

Jackson alleges that after he became a supervisor, he had to move about the entire ship where these various activities were taking place. He also would go back to his duties as a mechanic when his supervisory duties were not pressing.

Jackson testified that asbestos dust in his work environment at Ingalls "was very thick. It would even go down your collar, it would get in your ears, and get in your hair and be white all over your clothes .... It would look like snow sometimes .... Sometimes it would be so thick you couldn't see twenty or thirty feet."

In 1978, Jackson first consulted his family physician about breathing problems. He was diagnosed as having asbestosis. His treating physician, Dr. McAtee, estimated Jackson's pulmonary disability to be about 15 per cent at the time of the initial diagnosis but did not recommend that he discontinue working. Evidence introduced at trial indicated that Jackson's physiological im-

pairment has not progressed significantly since the time of the original diagnosis.

Jackson alleges that his asbestos-related disability has sapped his energy and stamina, made him susceptible to increased risks of infections and malignancies, impaired his ability to work, caused him mental frustration, necessitated the worry and expense of ongoing medical checkups, and reduced his life expectancy.

Before commencing work at Ingalls, Jackson held jobs with the Corps of Engineers and the Army. He also worked as an auto mechanic and in various other capacities. He testified that to the best of his knowledge these other jobs had never exposed him to asbestos, sandblasting, or toxic fumes. After quitting his job at Ingalls, Jackson worked for a natural gas company, first as a meter reader and at the time of this trial as a warehouseman.

Surveys of studies analyzing health hazards posed by excessive exposure to asbestos are readily available elsewhere.[1] We briefly sketch the more prominent developments in the ongoing scientific inquiry which are particularly pertinent to this case. Research projects dating from the 1920's, financed in part by Johns-Manville, indicated that exposure to excessive concentrations of asbestos dust over prolonged periods of time could produce asbestosis in asbestos workers.[2] A 1947 report of the American Conference of Governmental Industrial Hygienists recommended, in light of the hazards posed, threshold limit values

for exposure to asbestos of five million parts per cubic foot of air.[3]

In 1944, the first extensive study of the effects of asbestos on shipyard workers concluded that, because the researchers found few cases of asbestosis among the Navy shipyard workers studied, "asbestos covering of naval vessels is a relatively safe operation."[4] This report indicated, however, that most of its research subjects had been exposed to asbestos for fewer than ten years and cautioned that longer exposure would have resulted in a considerably greater incidence of asbestosis.

A 1965 study by I.J. Selikoff[5] concluded that the 1944 study was misleading. Finding evidence of asbestosis in about half the insulation workers examined, and in over 90% of the workers with over forty years experience, the Selikoff report indicated that asbestosis and related complications were "significant hazards among insulation workers" and indicated that previous threshold limit values were set too high. Other reports have confirmed these findings. *See Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1085 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); Special Project, An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation, 36 Vanderbilt L.Rev. 573, 601 (1983).

In response to a preliminary report of Dr. Selikoff's study, Johns-Manville in 1964 began placing warning labels on packages of its asbestos products.[6] Raybestos-Manhat-

1. For more thorough surveys of studies of the risks associated with asbestos, see *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1083–85 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); Special Project, An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation, 36 Vanderbilt L.Rev. 573, 596–605 (1983).

2. Johns-Manville financed research by the Metropolitan Life Insurance Company, reported in The Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers—Preliminary Study, 50 Public Health 1 (1935).

3. *See* Documentation of the Threshold Limit Values for Substances in Workroom Air, A.C. G.I.H. (3d ed. 1971). In 1968, the Conference

recommended the threshold limit value should be reduced to two million parts per cubic foot.

4. Fleisher, Viles, Gade & Drinker, A Health Survey of Pipe-Covering Operations in Constructing Naval Vessels, 28 J.Indus.Hygiene Toxicology 9 (1945).

5. Selikoff, Churg, and Hammond, The Occurrence of Asbestosis Among Industrial Insulation Workers, 132 Ann. New York Acad.Sc. 139 (1965).

6. In 1964, the Johns-Manville warning label read:

Caution, this product contains asbestos fibers. Inhalation of asbestos in excessive quantities over long periods of time may be

tan first attached warning labels to its asbestos cloth in 1972.

Jackson testified that in the nineteen years he worked at Ingalls Shipyard, he was never warned that asbestos could be harmful to his health. He also testified that he could recall having seen no asbestos packaging and hence no warning labels. He alleges that the defendants knew in the 1930's of the hazards of exposure to asbestos, yet worked in concert to keep this information secret, actively avoiding research that might confirm the relationship of asbestos to cancer.

On November 21, 1978, Jackson, along with other parties, filed a class action in diversity against numerous manufacturers and sellers of asbestos products allegedly used in shipbuilding at Ingalls. After the district court denied class certification, Jackson filed an amended and supplemental complaint against twelve defendants.[7] Eight of these defendants settled before trial. One was granted summary judgment.[8] The remaining defendants were: Johns-Manville Sales Corp.; H.K. Porter Company, Inc.; and Raybestos-Manhattan, Inc.

Jackson originally based his cause of action on theories of negligence, breach of warranty, strict liability, and conspiracy to suppress facts about the risks of exposure to asbestos. In accordance with a pretrial order, Jackson abandoned all causes of action except for strict liability in tort.

The jury found that Johns-Manville and Raybestos-Manhattan were strictly liable to Jackson and assessed actual damages of $391,500. The jury also assessed punitive damages of $500,000 against Johns-Manville and of $125,000 against Raybestos-Manhattan. The jury found that H.K. Porter Co. was not liable. Jackson does not appeal the verdict in H.K. Porter Co.'s favor.

## II. STRICT LIABILITY IN TORT

### A. *Scope of Protection*

The defendants argue that Jackson has no cause of action in strict liability in tort, because he was not actually a "user or consumer" of their asbestos products. In this diversity case, Mississippi substantive law applies. *See Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

In the seminal case of *State Stove Manufacturing Co. v. Hodges,* 189 So.2d 113, 118 (Miss.1966), *cert. denied, Yates v. Hodges,* 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967), Mississippi adopted § 402A of The Restatement (Second) of Torts (1965), "insofar as it applies to a manufacturer of a product." Section 402A provides, in part: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property . . . ."[9] By way of caveat, the

---

harmful. If dust is created when this product is handled, avoid breathing the dust. If adequate ventilation control is not possible, wear respirators approved by the United States Bureau of Mines for pneumoconiosis-producing dusts.

7. Jackson's amended and supplemental complaint named as defendants: Armstrong Cork Company; Acands, Inc.; American Mutual Corporation; Combustion Engineering, Inc.; Flintkote Corporation; Johns-Manville Sales Corporation; Keene Corporation; Owens-Corning Fiberglas Corporation; Owens-Illinois, Inc.; H.K. Porter Company, Inc.; Raybestos-Manhattan, Inc.; and Standard Asbestos Manufacturing & Insulation Company.

8. American Mutual Corporation, one of Ingalls' insurers, was granted summary judgment on

the ground that it had no duty to perform any loss prevention services with respect to asbestos hazards occurring during Jackson's employment.

9. Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

authors expressed no opinion as to whether § 402A should apply to persons other than "users or consumers."

The comments to § 402A indicate that the terms "users or consumers" were not meant to be interpreted in a fastidiously literal or technical fashion. "Consumers" include those who prepare the product for consumption: "the housewife who contracts tularemia while cooking rabbits for her husband is included within the rule ...." Comment (*l*), § 402A. "Users" include those "passively enjoying the benefit of the product" as well as those performing work upon it, as in the case of an employee repairing an automobile. *Id.*

Writing in 1965, the drafters noted that courts "thus far" had not extended strict liability protection beyond these rather flexible classifications of "users and consumers." The Institute expressed neither approval or disapproval of expanding the rule to encompass "casual bystanders" or "casual strangers." Comment (*o*), § 402A.

Soon after § 402A was published, several decisions expanded the rule to allow recovery for bystanders. In *Elmore v. American Motors Corp.*, 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84 (1969), Justice Peters found it consistent with the public policy of consumer protection and with economic theories of loss distribution to allow recovery for all foreseeable harm caused by defective products. Dean Prosser reports that this decision "is by now the rule of a slight majority of the courts. Its effect is obviously to put the strict liability on the same footing as negligence, as to all foreseeable injuries." Prosser, Law of Torts, § 100 at 663 (4th ed. 1971).[10]

The defendants argue that the Mississippi approach to bystander protection is contrary to this modern trend. We disagree.

It seems clear that Mississippi, while not explicitly adopting "bystander" and "user" as normative terminology, has in fact developed an approach to the problem of defining the reach of § 402A that is consistent with the modern trend of allowing recovery for foreseeable injuries.

In adopting § 402A, the *State Stove* court stated the requirements for strict liability in these terms: "the manufacturer is liable strictly in tort only if (a) he puts on the market a product which is not reasonably safe, and (b) the plaintiff is injured as a result of the contemplated use of it." 189 So.2d at 121. This formulation of strict liability made two noteworthy adjustments to the terms of § 402A. First, it abandoned the "user or consumer" terminology. Second, it added a requirement of "contemplated" use, hinting at foreseeability as a constraining factor on the class of plaintiffs protected under the rule. A review of the court's subsequent decisions on strict liability suggests that these adjustments were purposeful.

Three years after *State Stove*, the Mississippi court made explicit what it had previously hinted at in adding the requirement concerning "contemplated" use.

The strict liability rule for products liability cases adopted by this Court eliminates the necessity to show negligence in the manufacture of the product where it is shown that the product left the hands of the manufacturer in a defective condition, but this rule does not eliminate the requirement that, even where there is a defect in the product, that *there must be some duty owed to the plaintiff with regard to the defect, growing out of the intended normal use for which the product was manufactured.*

*Walton v. Chrysler Motor Corp.*, 229 So.2d 568, 573 (Miss.1969) (emphasis added). In

(a) *the seller has exercised all possible care in the preparation and sale of his product, and*

(b) *the user or consumer has not bought the product from or entered into any contractual relation with the seller.*

**10.** *See generally* King & Nevelle, The Bystander's Right Under Strict Liability Does Exist: A Call for Reform of the Restatement, 25 St. Louis U.L.J. 543 (1981); Noel, Defective Products: Extension of Strict Liability to Bystanders, 38 Tenn.L.Rev. 1 (1970); Comment, Strict Products Liability to the Bystander: A Study in Common Law Determination, 38 U.Chi.L.Rev. 625 (1971).

*Walton,* the plaintiff's automobile was struck from behind. The impact snapped a screw in the back rest, and the seat collapsed. The plaintiff was flung backward and then forward against the steering column. The court held that the manufacturer was not strictly liable for the plaintiff's injuries, because the "intended normal use" of the automobile did not give rise to a duty on the manufacturer's part to guard against a defect that did not cause or contribute to the cause of the accident.

*Walton* has been roundly criticized, both for reaching a questionable result and for injecting a negligence concept of duty into the doctrine of strict tort liability.[11] The defendants argue that *Walton* manifests the Mississippi court's unwillingness to extend strict liability protection to "bystanders." We disagree. *Walton*'s holding is not premised upon any classification of the injured driver as a "bystander" or "user." Instead, it invokes directly a standard of duty analysis to determine strict liability.

*Walton*'s fact context makes it clear that the court was concerned more with the source of the manufacturer's duty than with the class of persons to whom any duty would extend. But the two concerns are interrelated. If the manufacturer's duty to the plaintiff grows out of the contemplated or intended normal use of the product, then the plaintiff's entitlement to protection depends upon that contemplated or intended normal use. The scope of that duty appears to be defined by foreseeability as it relates to intended use.

A series of cases in which the Mississippi court has extended strict liability protection to parties that might be considered remote users or even bystanders bolsters this view and discredits the argument that Mississippi would restrict § 402A protection to a rigidly literal class of "users and consumers." In *Ford Motor Co. v. Cockrell,* 211 So.2d 833 (Miss.1968), a city employee noticed smoke rising from the motor of an unattended city truck. As he was about to lift the hood, the starter engaged and caused the truck to lurch forward and strike him. The court allowed recovery against the truck's manufacturer on a theory of strict liability in tort. The court did not discuss the "bystander/user" issue, but instead quoted, as it had in *State Stove,* Dean Prosser's commentary on *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916), a negligence case: "The conclusion is clear that the duty extends to any one who may reasonably be expected to be in the vicinity of the chattel's probable use, and to be endangered if it is defective." 211 So.2d at 836, *quoting State Stove,* 189 So.2d at 115–16, *quoting* Prosser, Law of Torts 661–63 (3d ed. 1964).

In *Falstaff Brewing Corp. v. Williams,* 234 So.2d 620 (Miss.1970), a cafe employee was told to move some bottles of beer. As she reached into the cooler, an untouched bottle exploded, injuring her hand. The court allowed recovery on a theory of strict liability in tort without specifically addressing the "user/bystander" issue. Similarly, the court, in *Fruehauf Corp. v. Trustees of First United Methodist Church,* 387 So.2d 106 (Miss.1980), avoided that issue while allowing recovery in strict liability for property damage. In that case, oil spewed into a church sanctuary when the nozzle on a dump trailer hydraulic line ruptured as the trailer was being operated across the street from the church. Although not addressing explicitly the issue of duty in either decision, the court in both *Fruehauf* and *Falstaff* quoted from *Escola v. Coca-Cola Bottling Co.,* 24 Cal.2d 453, 461, 150 P.2d 436, 440–41 (1944), in which Justice Traynor observed that even in the absence of negligence, "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." [12]

---

**11.** *See* Maraist and Barksdale, Mississippi Products Liability-A Critical Analysis, 43 Miss. L.J. 139, 180 n. 200 (1972). The authors queried whether *Walton* might not spell doom for strict liability in Mississippi. Those fears have proved misplaced.

**12.** Maraist & Barksdale, *id.* at 184, noted that *Falstaff* could arguably be interpreted as im-

The defendants cite *Oliver v. City Builders, Inc.,* 303 So.2d 466 (Miss.1974) as demonstrating Mississippi's restrictive approach to strict liability. In that case, the court refused "to change the existing rule [of caveat emptor] and to apply instead the products liability rule," *id.* at 467, holding that, as a matter of policy, real estate should not be subject to the same rules of strict liability as manufactured goods.[13] For similar policy reasons, the Mississippi court declined to impose on retail merchants "the absolute duty of inspecting for latent defects every article of wearing apparel ... that the retailer might offer for sale." *Sam Shainberg Co. v. Barlow,* 258 So.2d 242, 246 (Miss.1972). Mississippi's refusal to recognize strict liability causes of action in situations that present special policy concerns does not purport to restrict the scope of § 402A in causes of action that the court has found advance public policy. Strict liability actions against the manufacturers of defective products consistently have been put in the latter category.

In sum, except in limited circumstances where special public policy considerations indicate strict liability causes of action are not appropriate, the Mississippi court has demonstrated a willingness to afford broad consumer protection.

■ The Mississippi court has made it clear that manufacturers' liability is not without limits. The court has repeatedly disclaimed any intention of treating manufacturers as insurers for all harm caused by their products. *See General Motors Corp. v. Howard,* 244 So.2d 726, 728 (Miss.1971); *Ford Motor Co. v. Simpson,* 233 So.2d 797, 798 (Miss.1970); *Walton v. Chrysler Motor Corp.,* 229 So.2d at 570; *State Stove Manufacturing Co. v. Hodges,* 189 So.2d at 120. The Mississippi court has also injected into its strict liability principles the negligence concept of "duty." Though it has been variously expressed and intimated, it seems to be summarized thus: The manufacturer's duty grows out of the contemplated or normally intended use of its defective product and extends at least to those persons within the area of that use who can reasonably be foreseen to be endangered.

■ The trial court's instruction as to the manufacturer's duty in a § 402A cause of action under Mississippi law was proper. The jury was told that the duty extended "to those persons whom it should reasonably foresee would likely use such products or who are likely to come into contact with the danger, if any, inherent in the use of its product or products."[14] The defendants

---

plicitly embracing liability without fault. The same could be said of *Fruehauf.*

**13.** *Oliver* also indicated that an implied warranty would not run between parties in the absence of privity of contract. This aspect of the case was reversed in *Keyes v. Guy Bailey Homes,* 439 So.2d 670 (Miss.1983).

**14.** The trial court instructed the jury on the issue of the defendant's duty to Jackson:

The manufacture[r] of a product has a nondelegable duty to give an adequate warning of any dangers inherent in the use of its product or products to those persons whom it should reasonably foresee would likely use such products or who are likely to come into contact with the danger, if any, inherent in their use. That is, anyone whom it could reasonably foresee would likely be exposed to the danger, if any, during the use of its product, by any danger, if any, inherent in its use.

\* \* \* \* \* \*

There is no dispute that James Jackson was not an actual user of the asbestos products manufactured by these defendants. His alleged exposure occurred while he was working in the vicinity where these products were being installed aboard ships. The legal duties imposed upon manufacturers as stated by me herein, extend to anyone who may be reasonably expected or foreseen to be in the vicinity of the product's probable use and be endangered thereby, if any.

This duty to warn comes into play if, but only if, a manufacturer either actually knows or has reason to know or believe that its product is likely to be unreasonably dangerous for its intended use in the manner in which it is anticipated or foreseen or reasonably foreseen, that is, that it would be used, and that the alleged dangers or defects are not actually known to the user or others coming into contact therewith, or that they are not so open and obvious that they should be known by the users, or others coming into contact therewith while they are being used, through the exercise of ordinary and reasonable care, and based upon their own experience.

complain that this instruction allowed the jury to decide the legal question of whether § 402A protection extends to bystanders. The complaint is without merit. The court correctly interpreted Mississippi law, which bases the scope of § 402A on the manufacturer's legal duty with attendant factual considerations of foreseeability.

### B. *Failure to Warn*

■ The defect that makes a product "unreasonably dangerous" for strict tort liability purposes may be a design defect, a manufacturing defect, or a marketing defect. Special Project, 36 Vand.L.Rev. at 589. *See Carter v. Massey-Ferguson, Inc.,* 716 F.2d 344, 346 n. 1 (5th Cir.1983); *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276, 288 (5th Cir.1975). Jackson alleges that the defendants' failures to give him adequate warnings or directions constituted marketing defects that rendered the defendants' asbestos products unreasonably dangerous.

In *Migues v. Fibreboard Corp.,* 662 F.2d 1182, 1188 n. 11 (5th Cir.1982) (citations omitted), we stated:

> According to the Restatement, Section 402A, comment j, a seller has a duty to warn consumers or users of his product of known or knowable dangers attendant upon its use. A product may be "unavoidably unsafe," according to the Restatement, Section 402A, comment k, when it is incapable of being made safe for its "ordinary and intended use." Such a product may nevertheless be marketed if it provides important benefits, but the seller of such a product is responsible for informing consumers or users of the risk of harm. Moreover, manufacturers are "held to the knowledge and skill of an expert" in products liability cases. Manufacturers must therefore at least keep themselves informed of scientific discoveries concerning their products. Finally, a manufacturer's duty to warn extends to the ultimate user of his product, and his warnings must be given in such a way as to reach that user.

If the seller gives warning, he "may reasonably assume that it will be read and heeded ...." Comment j, § 402A.

The defendants argue that it is mere fantasy to suppose that bystanders or others "outside the marketing scheme" would ever receive a warning that merely accompanied the product. Rather, "the manufacturer would be required to resort to some form of public communication, such as television, radio or newspaper." Such advertising would not, they argue, be entitled to the Restatement's "presumption of efficacy." The defendants argue that under Mississippi law, the burden upon the manufacturer of undertaking such a warning campaign must be balanced against the possible benefits obtainable from such an undertaking. The defendants conclude that, as a matter of law, this balancing test would weigh in the manufacturer's favor with respect to persons in Jackson's position and that these products would thus not be unreasonably dangerous. We disagree.

This argument is partially mooted by our determination that the manufacturers' duty in strict liability did in fact extend to Jackson. Moreover, we find no precedent to indicate that Mississippi would hold that the duty to warn of dangers inherent in a product may be lessened by the difficulty of communicating that warning to those foreseeably in need of it.

The primary strict tort liability case upon which the defendants rely, *Pridgett v. Jackson Iron & Metal Co.,* 253 So.2d 837 (Miss. 1971), held that the seller of used products breached no duty to warn its vendee's employee where the vendee had in fact warned the employee and where the evidence showed that the product was in fact reasonably safe for its intended use. To the extent that *Pridgett* pertains at all to the case at bar, it undercuts the defendants' argument by suggesting that, in appropriate circumstances, the duty to warn a vendee's employees may be discharged quite simply through the vendee.

■ Nor do we find that defendants' suggested balancing test is compatible with the Restatement theory of strict tort liabili-

ty. With respect to products that are unavoidably unsafe, the manufacturer is under a duty to provide adequate warning of those dangers that are reasonably foreseeable. *Borel,* 493 F.2d at 1088. If the product is distributed without adequate warnings, then even if the benefits of the product outweigh the risks, an unreasonably dangerous product remains so, and the manufacturer is strictly liable to those who are foreseeably endangered. Whether the warning is adequate as to a particular plaintiff in form, content, or dissemination is a matter of fact, not law. When a warning is required its absence is *per se* an inadequate warning.

■ The defendants do not argue that the jury lacked sufficient evidence to find their products unavoidably unsafe. Those products were distributed without any warning and hence were unreasonably dangerous. The issue of whether ability to warn a bystander could affect the adequacy of a warning actually made is not a viable issue in this case.

## III. ONE CAUSE OF ACTION OR TWO

During the course of the trial, Jackson called several expert witnesses who testified at length about the role that exposure to asbestos fibers plays in the etiology of lung cancer, mesothelioma, and other malignancies. Three of these expert witnesses testified that, based upon statistical risks adduced from epidemiological studies and upon examinations of portions of Jackson's medical record, they believed that Jackson had a greater than fifty percent chance of contracting an asbestos-related cancer in the future.[15]

The defendants argue that this evidence about the relationship between asbestos exposure and cancer was irrelevant, because the proof showed that Jackson had only a mild case of asbestosis, resulting in a fifteen percent disability. They argue that the trial court committed reversible error in failing to exclude the testimony concerning the potential for later development of cancer, which alarmed the jury and unfairly prejudiced the defendants.

■ We hold as a matter of substantive law that the present state of the record limits Jackson's right to recover damages to any disability resulting from asbestosis. Therefore, the court erred in not excluding the evidence about cancer since Jackson did not prove that he presently suffers from that disease.

In arguing that the cancer evidence was properly admissible, Jackson relies on the general rule of tort law that allows for recovery of all harms—past, present, and prospective—legally caused by a tort. "[W]here it is established that future consequences from an injury to a person will ensue, recovery may be had, but such future consequences must be established in terms of reasonable probabilities." *Entex, Inc. v. Rasberry,* 355 So.2d 1102, 1104 (Miss. 1978). *See Garrett v. Wade,* 259 So.2d 476 (Miss.1972). *See also Wilson v. Johns-Manville Sales Corp.,* 684 F.2d 111, 119 (D.C.Cir. 1982). This is the traditional "all or nothing" approach, whereby the plaintiff becomes entitled to full compensation for those prospective damages that are proved to be "probable" (a greater than 50 percent chance), but is not entitled to any compensation if the proof does not establish a greater than 50 percent chance.[16] Jackson argues that the expert testimony was relevant in establishing the requisite probability of future harm from cancer.[17]

---

**15.** The only one of Jackson's expert witnesses actually to examine him was the local treating physician, Dr. McAtee, who testified that, in his opinion, Jackson would not contract cancer.

**16.** *See Wilson v. Johns-Manville Sales Corp.,* 684 F.2d 111, 119 (D.C.Cir.1982); Restatement (Second) of Torts § 910, comment a; King, Causation, Variation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 Yale L.J. 1353, 1371–72 (1981); Note, Damage Contingent Upon Chance, 18 Rutgers L.Rev. 875, 876 (1964).

**17.** We dismiss out of hand the defendants' incredible argument that statistics do not prove probability.

It is evident, however, that the all-or-nothing rule is predicated on an assumption that a cause of action has accrued with respect to the prospective harm for which recovery is sought.[18] The real question is whether, when Jackson's cause of action accrued for asbestosis injuries, a cause of action accrued simultaneously for cancer injuries, even though Jackson had not developed cancer at the time of trial.

The proof discloses that asbestosis and cancer are distinct diseases. Asbestosis is a fibrosis or scarring of the lungs resulting from inhalation of asbestos fibers. It is not a cancerous process. It is not always fatal, but can cause progressive deterioration of the pulmonary function and lung volume. There is a direct relation between cumulative exposure levels to asbestos and development of the disease. Cigarette smoking is not a contributing factor. Generally, asbestosis has a latency period of ten to twenty-five or more years, from time of initial exposure until manifestation of the disease.[19]

Mesothelioma is a rare form of malignancy which occurs in the thin membrane, or epithelium, that lines the surfaces of the lungs and of the abdominal cavity. Jackson's expert testified that as little as a week's exposure to asbestos could trigger the disease. The best available evidence does not indicate that cigarette smoking contributes to the development of the disease. The latency period may be from twenty to forty years or more. The disease is invariably fatal.[20]

The development of asbestos-related lung cancer (pulmonary and bronchogenic carcinoma) occurs mainly in the lower lobes of the lungs and is correlated with the degree of exposure to asbestos fibers. Cigarette smoking greatly enhances the risks. The latency period is fifteen to thirty-five years.[21]

Evidence introduced at trial indicates that asbestos is linked, to a lesser degree, with other types of malignancies. It can cause benign, non-disabling conditions, such as asbestos corns and callouses on the hands of workers who handle raw asbestos. Asbestos inhalation has also been linked to heart disease. It can also cause thickening (plaque) or calcification of the membrane (pleura) covering the outer surface of each lung.

Jackson does not claim that he has cancer. He has produced no evidence that asbestosis will inevitably lead to cancer. The proof adduced does not demonstrate any relation between the pathologies of asbestosis and cancer, except that the diseases can be precipitated by the same pathogen or carcinogen. Viewed from this perspective, Jackson's claim for asbestosis injuries adds nothing to his claim for cancer damages. Had he attempted to recover for cancer damages before he had manifested any disease at all, his evidentiary burden of establishing his entitlement to compensation for future cancer would be no different from that in the present posture of this case. It would not be carried by proof that he was exposed to asbestos fibers and that, statistically, he was at over 50% risk of contracting cancer.

Causality as an operation of physical events which may culminate in future harm must be distinguished from causality as an operation of law which may culminate in a claim for future harm. In the context of a latent disease case, causality poses a novel

---

**18.** Comment a, Section 910 of the Restatement (Second) of Torts, states: "[a]ssuming . . . that a cause of action has arisen at the time when the action is brought . . ., the injured person is entitled to recover damages" for prospective harms.

**19.** For a discussion of asbestosis, see *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d at 1083; J. Selikoff & D. Lee, Asbestos and Disease 143–56 (1978); Special Project, 36 Vand.L. Rev. at 579 n. 10.

**20.** See *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d at 113; J. Selikoff & D. Lee, Asbestos and Disease 241–44, 262–66; Special Project, 36 Vand.L.Rev. at 579 n. 11.

**21.** See J. Selikoff & D. Lee, Asbestos and Disease 307–21, 26–27; Special Project, 36 Vand. L.Rev. at 579 n. 12.

question whether the accrual of a claim based on the manifestation of one disease results in the simultaneous accrual of claims based on "probable" future manifestations of physically separate diseases. The ultimate question is how abstractly to characterize the wrong that underlies the cause of action.

We find no precedent that squarely addresses the issue before us. However, courts addressing the limitation of action issue in latent disease cases frequently have addressed many of the relevant considerations. They can inform our decision.

A few courts have adopted a limitations rule that measures the accrual of a cause of action from the time the offending substance invades the body.[22] These courts employ the rule that would obtain in a traditional trauma case, reasoning that the injury is the initial harmful contact and not the maturation of disease. See Note, Preserving Causes of Action in Latent Disease Cases: The *Locke v. Johns-Manville Corp.* Date-of-the-Injury Accrual Rule, 68 Va.L. Rev. 615, 620–22 (1982).

A majority of courts,[23] however, have adopted a rule of discovery, under which "the cause of action does not accrue until the injury is discovered or in the exercise of reasonable diligence should have been discovered." *Borel,* 493 F.2d at 1102 (construing Texas law). See Special Project, 36 Vand.L.Rev. at 642–47.

In *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), the Supreme Court applied the discovery rule in determining, for limitations purposes under the Federal Employers' Liability Act, the time of accrual of a railroad fireman's claim for damages resulting from his contraction of silicosis, many years after his initial exposure to silica dust. The Supreme Court noted that a "mechanical analysis" of the accrual of the plaintiff's cause of action,

attempting to measure the disease from some specific moment of contact with silica dust, would afford the plaintiff only a delusive remedy.... It would mean that at some past moment in time, unknown and inherently unknowable even in retrospect, [the plaintiff] was charged with knowledge of the slow and tragic disintegration of his lungs; under this view [the plaintiff's] failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded on his consciousness would constitute waiver of his right to compensation at the ultimate day of discovery and disability.

\*   \*   \*   \*   \*   \*

It follows that no specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time; consequently the afflicted employee can be held to be "injured" only when the accumulated effects of the deleterious substance manifest themselves.

*Id.* 69 S.Ct. at 1025, *quoting Associated Indemnity Corp. v. Industrial Accident Commission,* 124 Cal.App. 378, 381, 12 P.2d 1075, 1076 (1932).

Although the Mississippi court has not specifically addressed the time of accrual of a strict liability cause of action in a latent disease case, it is clear that Mississippi would apply the discovery rule. The Mississippi court has held, in *Ford Motor Co. v. Broadway,* 374 So.2d 207, 209 (Miss.1979), that the limitations period for strict products liability actions is governed by Section 15–1–49 of the Mississippi Code Ann. (1972), which provides: "All actions for which no other period of limitation is prescribed shall be commenced within six years next after

---

**22.** *See, e.g., Steinhardt v. Johns-Manville Sales Corp.,* 54 N.Y.2d 1008, 430 N.E.2d 1297, 446 N.Y.S.2d 244 (1981); *Garrett v. Raytheon Co.,* 368 So.2d 516, 521 (Ala.1979); *Peterson v. Roloff,* 57 Wis.2d 1, 203 N.W.2d 699 (1973).

**23.** *See, e.g., Wilson v. Hartzman,* 373 So.2d 204 (La.App.), *cert. denied,* 376 So.2d 961 (La. 1979); *Hughes v. Eureka Flint & Spar Co.,* 20 N.J.Misc. 314, 26 A.2d 567 (1939); *Tennessee Eastman Corp. v. Newman,* 22 Tenn.App. 270, 121 S.W.2d 130 (1938); *Plazak v. Allegheny Steel Co.,* 324 Pa. 422, 188 A. 130 (1936).

the cause of such action accrued, and not after." The court observed:

> The statute of limitations in strict products liability cases should strike a balance between the necessity of providing the consumer with adequate time within which to discover a defect and institute an action, and the need to provide the manufacturer with a definite period of liability and a date on which his exposure to suit ends . . . . [W]e hold that . . . the statute begins to run from the time that injuries are sustained.

*Ford Motor Co. v. Broadway,* 374 So.2d at 209.

The court's recognition of the plaintiff's need to have adequate time in which to vindicate his rights commands the view that the Mississippi court would follow the judicial trend in adopting the discovery rule for strict liability latent disease cases, rather than put upon the plaintiff the uneasy burden of instituting a claim for injuries unknown and unknowable as of the time of initial exposure to the potential pathogen. In this context, the "sustained" injury must be equated with the physical manifestation of disease. The corollary is that the actionable delict in strict liability for physical injury is the generation of disease in the plaintiff's body, and not the initial exposure of the plaintiff to potentially hazardous substances or some more abstract invasion of the plaintiff's legally protectible interests.

The question remains, however, whether, upon the manifestation of one disease, a cause of action accrues for all prospective diseases, so that the plaintiff has the right (and in a limitations context, the duty) to seek recovery for physically distinct and separate diseases that may or may not develop in the future. The courts that have considered this issue in the limitations context have said no.

In *Wilson v. Johns-Manville Sales Corp.,* 684 F.2d 111 (D.C.Cir.1982), the court determined that a diagnosis of "mild asbestosis" in 1973 did not start the limitations period running for the separate and distinct disease of mesothelioma, first manifested in 1978. The court noted that there was a tension between the underlying evidentiary and repose considerations. The court observed that although it would best serve the defendant's interests in repose to have all contingent claims accrue simultaneously, the evidentiary concerns of "the existence of the [prospective] disease, its proximate cause, and the resultant damage" are better served by allowing the evidence to develop over time. *Id.* at 119. The court then determined that the plaintiff's interest in receiving adequate compensation and the defendant's interest in paying no more than that were best served by recognizing discrete causes of action for discrete injuries. *Id.* Finally, the court held that considerations of judicial economy weighed in favor of recognizing separate causes of action, lest the plaintiff be compelled to rush to court upon the first manifestation of an injury not in itself worthy of litigation, rather than risk losing all claims for future serious injuries. *Id.* at 120. *Accord, Pierce v. Johns-Manville Sales Corp.,* 296 Md. 656, 464 A.2d 1020 (1983).

In *Goodman v. Mead Johnson & Co.,* 534 F.2d 566 (3d Cir.1976), in a cause of action against a manufacturer of contraceptive drugs, the court held that, for limitations purposes, the plaintiff's cause of action for cancer did not accrue simultaneously with the manifestation of thrombophlebitus years earlier. The court based its decision on a causation analysis, reasoning that the two diseases were not products of the same "chain of causality." Rather, the manufacturer had exposed the plaintiff to two distinct risks, incurred distinct duties to test and warn, and hence was subject to two distinct causes of action. *Id.* at 574.

In *Martinez-Ferrer v. Richardson-Merrell, Inc.,* 105 Cal.App.3d 316, 164 Cal.Rptr. 591 (1980), a California court recognized separate causes of action for limitations purposes created by the independent and non-simultaneous injuries of dermatitis and cataracts, though both resulted from the plaintiff's taking an anti-cholesterol drug. The court observed:

If the manufacturer of such a drug is liable for the long-delayed effects of his product, it advances no coherent public policy to absolve him of that liability simply because right after the ingestion of the drug the user suffered other, different, independent and relatively innocuous side effects for which he did not bother to sue.

*Id.* 164 Cal.Rptr. at 595. The court concluded that the otherwise useful rule of law against claim splitting should not be applied where it would lead to injustice. *Id.* 164 Cal.Rptr. at 596.

The issue before us is not, of course, whether Jackson's claim has expired by the operation of the limitations period. The question is whether a cause of action has arisen for injuries other than asbestosis. As they relate to the analysis of the underlying theory of causation, however, the two issues involve identical values. Furthermore, the policy considerations that inform the divisibility of claims for purposes of measuring limitations periods and applying principles of res judicata are the same policy considerations that drive the determination of when separate causes of action arise.

As applied in limitations cases, the discovery rule operates under the assumption that the plaintiff sustains no actionable injury when the pathogen enters the body. "[T]he injurious consequences are the product of a period of time ...." *Urie v. Thompson,* 69 S.Ct. at 1025. The completion of the incubation period and manifestation of the disease create the causation of actual injury and the accrual of the cause of action. When the plaintiff develops asbestosis, the causation condition is fulfilled for that injury. Causation is complete and the defendant is liable for all damages—past, present, and future—that the proof shows will probably develop as a consequence of the asbestosis injury. Until and unless the plaintiff develops cancer, however, the causation of cancer has not occurred. The plaintiff is denied recovery for prospective damages associated with cancer not because the evidence of future consequences is insufficiently reliable, but because, as a matter of substantive law, there can be no consequence until there is effect, and no effect without completed cause.

■ Plaintiff cannot create a cause of action for the physically separate and distinct disease of cancer from the cause of action for asbestosis injuries actually sustained by proof that if asbestos fibers have caused asbestosis, the same exposure probably will result in cancer at a later time. To permit this assumption of causation to control liability would cause massive dislocations in the rights of parties. The proof shows that asbestos fibers may cause asbestosis. It also shows that asbestos fibers may cause cancer. But it does not show that asbestosis may cause cancer. Logic and justice require that presently latent injuries must await their separate maturity as a cause of action. A doctrinaire application of the reasonable certainty rule would result in a mismatching of entitlement, liability, and compensation. "Persons who contract the first, but not the second, disease will receive a windfall and, in the aggregate, the defendant will overcompensate the injured class." *Wilson v. Johns-Manville Sales Corp.,* 684 F.2d at 120 n. 45. This problem is especially acute where the proof of greater-than-50% probability derives from statistical data that would support prospective recovery universally for a class that, according to the same proof, would suffer much less than universal disability.

To permit "recovery" for harms not yet effected would contravene Mississippi's clear policy against treating manufacturers as insurers of their products. Whatever benefit lies in allowing some plaintiffs present compensation for speculative future injury must be balanced against the need for maintaining viable enterprises that can accomplish the risk distribution purpose of strict liability for those persons who are caused injury by a defendant's product. *See Ward v. Hobart Manufacturing Co.,* 450 F.2d 1176, 1189 (5th Cir.1971) (construing Mississippi law).

The detriment to defendants of allowing claims for uneffected future harms is mani-

fest. A plaintiff who suffered the injury of asbestos callouses on his hands, for instance, plausibly could institute an action, based on expert testimony of statistical probability, to recover not only for callouses but for future injuries that ran the gamut from asbestosis to mesothelioma to lung cancer. The defendants' interests in repose pale against the interests of equitable exposure to liability.

On the other hand, the plaintiff suffers little if any detriment by being required to await manifestation of a condition before having a claim for damages resulting from that class of conditions. The quality of the plaintiff's evidence of cancer injury is likely to improve with the passage of time. Indeed, the plaintiff has a better chance of securing fair compensation for his injuries when the injury has actually manifested itself and medical certainty can replace speculation.

Our holding that the causes of action must be divided for purposes of seeking recovery for future harm requires that they also be discrete for limitations purposes. It would disadvantage a plaintiff unfairly and disserve judicial economy to measure the limitations periods for future diseases from the time of manifestation of a separate and distinct disease.

Because the claims for separate injuries are divisible, the plaintiff would not be barred from bringing a subsequent suit based on claims for separate and distinct injuries within the applicable limitation period following the materialization of the later disease. *Cf. Everett Plywood Corp. v. United States,* 512 F.2d 1082, 1087 (Ct.Cl. 1975) (separate action founded on single indivisible contract may be brought later if it was incapable of being asserted when earlier suit was commenced). Commanded by the recognition of separate causes of action, this result also is consistent with recognized exceptions to the rule against claim splitting. Section 26 of the Restatement (Second) of Judgments provides that the general rule against claim splitting is rendered inapplicable where:

(b) The court in the first action has expressly reserved the plaintiff's right to maintain the second action; or

\* \* \* \* \* \*

(f) It is clearly and convincingly shown that the policies favoring preclusion of a second action are overcome for an extraordinary reason. . . .

This court has recognized that "[p]rinciples of res judicata are not ironclad," but must be applied to accomplish justice in the light of public policy. *Bogard v. Cook,* 586 F.2d 399, 408 (5th Cir.1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979). *See also Dore v. Kleppe,* 522 F.2d 1369, 1374 (5th Cir.1975); *Stevenson v. International Paper Co.,* 516 F.2d 103, 109 (5th Cir.1975); *Bennett v. Commissioner of Internal Revenue,* 113 F.2d 837, 839 (5th Cir.1940) ("res judicata is a principle of peace"). In this case, justice requires that the cause of action for cancer stand upon its own base.

Jackson argues that evidence of the relationship between asbestos use and cancer is relevant to issues apart from the extent of prospective injuries to his health. He argues that the evidence is relevant to establishing elements of the defendants' liability, specifically whether the defendants had notice of foreseeable hazards, whether warnings were adequate or necessary, and whether the defendants met their duty to test their products. Because Jackson's recovery for asbestosis disability is the limit of his present right of action, however, the evidence about cancer is not relevant to establishing any element of the defendants' liability with respect to their failures to warn of the specific risks upon which Jackson's cause of action is predicated.

Jackson also argues that cancer evidence is relevant to his claim for compensation for future medical examinations that will be required to determine if any cancer has appeared. Although the cancer evidence may be relevant to this discreet issue in establishing the types and costs of future medical examinations, such evidence must be weighed by the trial court in the light of our opinion here under Rule 403 of the Federal Rules of Evidence, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

There is substantial danger that the defendants would be unfairly prejudiced by proof that a dread disease is a probable result of plaintiff's exposure. The jury also may be confused about the limits of Jackson's present rights of action if the cancer evidence is put before them now. Jackson can readily establish the reasonable necessity and expense of future medical examinations by other means of proof, including, for any reasonable defendant, a stipulation. The weight of these values is for the trial court in the first instance. On the record before us now, we conclude that the trial court erred in not excluding the evidence of cancer since proof of the existence of the disease was not made.

If, at any time in the future, Jackson claims that he has contracted cancer and that asbestos fibers caused that disease, he has a new cause of action, with new damages. His right to commence that action arises at the time he knows or in the exercise of reasonable diligence should have discovered that he has contracted the disease. The statute of limitations commences to run from the same time.

We do not address the questions of res judicata or collateral estoppel that might arise later, because we cannot predict what findings the court and jury will make when this case is retried. We note generally that in a second suit on a different cause of action, "the parties are estopped from relitigating only those issues actually and necessarily decided in the first suit." *Dore v. Kleppe,* 522 F.2d 1369, 1374 (5th Cir. 1975). *See also Castillo v. Railroad Retirement Board,* 725 F.2d 1012, at 1014 (5th Cir.1984); *Stevenson v. International Paper Co.,* 516 F.2d 103, 109 (5th Cir.1975).

## IV. MENTAL DISTRESS

The trial court denied the defendants' request that the jury be instructed that, as a matter of law, it could not consider Jackson's alleged mental anguish for his purported increased risk of cancer. The trial court instead charged the jury that Jackson was entitled to compensation for "[a]ll physical pain and mental anguish suffered by him to date and such as he is reasonably certain to suffer in the future as a direct result of his complained of condition." [24] Our holding here makes a ruling on defendants' objection unnecessary.

Jackson argues that this instruction failed to authorize any recovery for fear or risk of cancer, because "there was, of

---

24. The trial court instructed further on this issue:

In this regard also, you may consider any aggravation of an existing disease or physical defect or activation of any such latent condition, resulting from the injury. If you find from a preponderance of the evidence there was such an aggravation, you should determine, if you can, what portion or part of plaintiff's condition—or condition complained of, that is, resulted from the aggravation and make allowance in your verdict only for that aggravation. Under the law a wrong-doer takes a person as he finds him, with all of his pre-existing disabilities and infirmities of body, and if you find for the plaintiff against any or all of the defendants in this case then each such defendant against whom you find from a liability standpoint, is liable for any and all aggravation of any pre-existing injury or condition of the plaintiff proximately caused by its conduct, if any, and in which event the plaintiff would be entitled to recover reasonable damages to fairly compensate him for such aggravation of his pre-existing condition, if any.

Now, with respect to the measure of damages and the degree of proof required, the law does not prescribe any measure by which damages for physical pain and suffering and mental anguish can be determined, but leaves it to your sole discretion to fix such amount and such sums as may be deemed just and proper, under all the circumstances. The law does not require the plaintiff to prove his damages for pain and suffering and mental anguish in dollars and cents; all the law requires is that he prove the extent of his injuries, and then it is for you the jury to determine the amount of damages, if any, which should be awarded to him for past and future physical pain and suffering and mental anguish.

course, at no point any claim that the 'complained of condition' of Mr. Jackson was cancer." Jackson made no objection to the trial court's refusal expressly to authorize recovery for fear of risk of cancer. Since our holding here bars the proof allowed in the first trial on the issue of damages for potential cancer, we leave to the trial court's initial exercise of discretion whether evidence of Jackson's fear of the risk of cancer should be admitted on retrial under Fed.R.Evid. 403 and whether such a claim is permitted by the pleadings. While all values are not identical, many of the same considerations discussed with regard to future medical examinations are relevant.

## V. PROXIMATE CAUSATION

For the guidance of the district court on retrial we now hold that the quantum of evidence Jackson adduced in the original trial was sufficient to raise a jury issue as to causation in fact.

It is undisputed that Jackson suffers from asbestosis and that asbestos fibers caused the disease. Jackson is unable, however, to prove with certainty that on a specific day in a specific compartment of a specific ship he came in contact with the defendants' products. Rather, he relies on circumstantial evidence which shows that Raybestos-Manhattan products were ordered for use on at least seven to ten of the approximately sixty-nine hulls on which he worked during his career. Johns-Manville products were ordered for use on thirty or more of the hulls. Some of Jackson's former co-workers testified that they recalled working with Johns-Manville and Raybestos-Manhattan products in very dusty conditions.

■ Under Mississippi substantive law, the plaintiff's burden is to show that the defendant "shall have been the proximate, or a contributing, cause of injury to anoth-

er; and in order that it shall be a proximate or contributing cause it must have been a substantial factor in producing the injury." *New Orleans & N.E.R. Co. v. Burge,* 191 Miss. 303, 2 So.2d 825, 826 (1941).

■ Federal law provides the standard for determining the sufficiency of the evidence. *Fairley v. American Hoist & Derrick Co.,* 640 F.2d 679, 681 (5th Cir.1981). Under that standard, we do not find that the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable men could not arrive at the conclusion that the products of these defendants were substantial factors in producing Jackson's injuries. *See Borel,* 493 F.2d at 1094; *Boeing Co. v. Shipman,* 411 F.2d 365, 375 (5th Cir.1969) (en banc).

The jury had sufficient evidence to find that the defendants' failures to warn proximately caused Jackson's injuries. If warnings are given, a presumption arises that they will be read and heeded. Restatement (Second) of Torts § 402A, comment j. In the absence of any warning, the burden shifts to the defendant to show that the plaintiff would have sustained his injuries even if warnings had been given. *See New Orleans & N.E.R. Co. v. Burge,* 2 So.2d at 827.[25] The defendants made no such showing.

Raybestos-Manhattan argues that it and H.K. Porter Co. were in legally and factually indistinguishable positions with regard to their distributions of asbestos cloth to the shipyard, except that H.K. Porter Co. supplied asbestos cloth on many more of the vessels on which Jackson worked. Nevertheless, the jury absolved H.K. Porter Co. while holding Raybestos-Manhattan liable. Raybestos-Manhattan argues that the jury could have reached this result only on the basis of a chain of untenable inferences.

We addressed a similar issue in *Borel,* 493 F.2d at 1094:

**25.** Other states have recognized the presumption that an adequate warning would be heeded. *See, e.g., Borel,* 493 F.2d at 1093, (construing Texas law); *Wolfe v. Ford Motor Co.,* 6 Mass.App. 346, 376 N.E.2d 143, 147 (1978); *Rawlings Sporting Goods Co. v. Daniels,* 619

S.W.2d 435, 439 (Tex.Civ.App.1981); *Menard v. Newhall,* 135 Vt. 53, 373 A.2d 505, 506 (1977); Sales, The Duty to Warn and Instruct for Safe Use in Strict Tort Liability, 13 St. Mary's L.J. 521, 549 (1982).

This inconsistency in the jury's verdicts, although puzzling, need not detain us. It has long been the rule that consistency in general verdicts is not required. *Dunn v. United States,* 1932, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356. "Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty . . . is immaterial. Juries may indulge in precisely such motives or vagaries." *United States v. Dotterweich,* 1943, 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48. Thus, even if the general verdicts are internally inconsistent, such is the jury's prerogative if, as we have found, there is evidence to support the finding reached by the jury.

## VI. PUNITIVE DAMAGES

Special problems attend awards of punitive damages in the myriad actions which have arisen from the catastrophic nationwide exposure of workers to asbestos. The scope of this mass litigation is without precedent and practically without dimension. A recent independent study for the U.S. Department of Labor estimates that "there are presently more than 21 million American workers . . . who, in the past forty years, were significantly exposed to asbestos." Selikoff, Report to the U.S. Department of Labor, Disability Compensation for Asbestos-Associated Disease in the United States 4 (1982), *reported in* Seltzer, Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control, 52 Fordham L.Rev. 37, 37 n. 1 (1983). The study projected over 200,000 deaths from asbestos-related cancers by the end of the century. *Id.* That number does not include deaths from asbestosis. *Id.*

It has been reported that over 20,000 personal injury lawsuits have been filed in connection with workers' asbestos injuries. *Congress Grapples with Toxic Torts,* Nat'l L.J., Jan. 31, 1983, at 30, col. 1, *reported in* Seltzer, 52 Fordham L.Rev. at 37 n. 1. Johns-Manville states on brief that currently over 14,000 cases are pending against it in the United States, seeking over fifty billion dollars in damages, far beyond its financial resources. It reports that over 9,300 of those suits seek punitive damages and that over three million dollars in punitive damages already have been awarded. *See* Seltzer, 52 Fordham L.Rev. 37, 39 n. 11 (itemizing punitive damages awarded in previous cases). Raybestos-Manhattan states that as of May 1, 1982, it was a defendant in 11,071 suits involving 14,007 plaintiffs. It reports it has been assessed punitive damages of $500,000, in addition to those assessed in the instant verdict. Of the hundreds of these cases pending in the federal courts in Mississippi, this is the first to come before us on appeal.

Even assuming that the scope of the problem were overstated by defendants or that many of the cases currently pending against the defendants eventually would be settled, the defendants still would face an open-ended and overwhelming liability. Independent studies establish that if currently latent injuries become manifest among those workers who have been exposed to asbestos at the rates projected, the results could be catastrophic. The defendants argue that repeated assessments of punitive damages in the actions already filed threaten to exhaust their resources, making them unable to satisfy future compensatory or punitive awards.[26]

The grave reality of the need to maintain viable enterprises to meet future compensation liabilities to already injured persons

---

**26.** It has been noted that the risk posed by unrestrained awards of punitive damages are not confined to a single industry. "Large assessments of punitive damages may not yet be a major threat to the continued viability of most manufacturing concerns, but the increasing number and size of such awards may fairly raise concern for the future stability of American industry." Owen, Problems in Assessing Punitive Damages Against Manufacturers of Defective Products, 49 U.Chi.L.Rev. 1, 6 (1983). *See also* Seltzer, Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control, 52 Fordham L.Rev. 37, 37–40 (1983).

and those with latent diseases commands consideration of the whole picture rather than a myopic, mechanical analysis that would look to this cause of action alone and deny that there exist tens of thousands of others, and the potential for many times more.

Writing in *Roginsky v. Richardson-Merrell*, 378 F.2d 832, 839, 841 (2d Cir.1967), Judge Friendly observed that:

> The legal difficulties engendered by claims for punitive damages on the part of hundreds of plaintiffs are staggering .... We have the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill .... [A] sufficiently egregious error as to one product can end the business life of a concern that has wrought much good in the past and might otherwise have continued to do so in the future, with many innocent stockholders suffering extinction of their investments for a single management sin.

*Roginsky* involved an anti-cholesterol drug, MER/29, which had been found to cause adverse effects, primarily cataracts, in some consumers. The drug was distributed for about two years before being withdrawn from the market in 1962. When *Roginsky* was decided in 1967, there were currently "several hundred" other cases pending against the manufacturer.[27]

Judge Friendly noted that the MER/29 actions bore little resemblance to those types of actions for which punitive damages had historically been awarded, where victims were few in number and the prospects for litigation clearly confined. *See id.* at 838–39. Asbestos actions bear little resemblance either to the traditional punitive award situation or to the MER/29 situation. In asbestos litigation, we are concerned with exposures that occurred over decades. The victims are not limited to those who used or consumed the product directly. The potential injuries are more severe and more

diverse. The latency period is far longer. Far more cases are pending, and the prospects for future litigation are almost limitless.

*Roginsky* was tried upon theories of negligence and fraud, not strict liability. Judge Friendly decided that the applicable New York case law afforded him no basis to disallow punitive damages in these causes of action in the MER/29 situation. *Id.* at 846.

■ Mississippi substantive law would disallow punitive damages in the instant strict liability litigation. In the extraordinary circumstances in which this litigation is set, the allowance of punitive damages is incompatible with the objectives of and would disrupt the viability of the strict liability cause of action. Moreover, the basic policy objectives of punitive damages are satisfied in this instance by defendant's multiple exposure to compensatory damages. Therefore, punitive damages are inappropriate in these extraordinary circumstances.

Strict liability in Mississippi is founded on the dual policy objectives of accomplishing economic loss distributions and promoting consumer safety. "The purpose of [strict tort liability] is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." *State Stove Manufacturing Co. v. Hodges,* 189 So.2d at 120, *quoting Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1962). *See also* The Restatement (Second) of Torts § 402A, comment (c). This policy seeks not merely to assure compensation for the individual plaintiff, but to achieve the broader societal objective of equitable loss distribution.

Essential to the maintenance of effective loss distribution in strict liability is the presence of viable enterprises that can ab-

---

27. For a discussion of the mass tort litigation involving MER/29, see Seltzer, Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control, 52 Fordham L.Rev. 37, 51–55 (1983).

sorb the losses and compensate victims for their injuries. If the enterprise should fail, early victims would receive compensation but others whose latency periods were longer would receive no compensation at all. At the point where awards of punitive damages destroy the viability of the enterprises necessary to accomplish loss distribution, the remedy of punitive damages becomes incompatible with the strict liability cause of action. The later victims, not the enterprise, effectively bear the punishment. In the mass catastrophe now maturing from pervasive asbestos exposure, the allowance of punitive damages could destroy the marginally viable system of loss distribution in strict liability.

Punitive damages under Mississippi law require a showing of wanton, gross, or intentionally wrongful conduct. *Hart v. Walker,* 720 F.2d 1436, 1442 (5th Cir.1983) (construing Mississippi law); *State Farm Mutual Auto Insurance Co. v. Roberts,* 379 So.2d 321 (Miss.1980). Punitive damages are granted "in the nature of punishment for the wrongdoing of the defendant and as an example so that others may be deterred from the commission of similar offenses thereby in theory protecting the public." *Snowden v. Osborne,* 269 So.2d 858, 860 (Miss.1972).

Because such damages are assessed as a punishment and as an example to others, they are not favored in law. *Lee v. Southern Home Sites Corp.,* 429 F.2d 290, 294 (5th Cir.1970) (construing Mississippi law). *See also Ratner v. Sioux Natural Gas Corp.,* 719 F.2d 801, 805 (5th Cir.1983) (construing Texas law). Punitive damages "should be allowed only with caution and within narrow limits." *Consolidated American Life Insurance Co. v. Toche,* 410 So.2d 1303, 1304–05 (Miss.1982); *Standard Life Insurance Co. of Indiana v. Veal,* 354 So.2d 239, 247 (Miss.1977). In determining whether punitive damages should be allowed in this case it is necessary to evaluate the wisdom of imposing pecuniary punishment in this class of cases and the advisability of using punitive damages as a deterrent to future conduct, as well as the nature of the conduct involved. *See Gore v. Turner,* 563 F.2d 159, 164 (5th Cir.1977) (construing Mississippi law); *Lee v. Southern Home Sites Corp.,* 429 F.2d 290 at 294.

In authorizing the imposition of punishment, courts seek only to effectuate the general objectives of retribution and reformation. Excessive punishment is antithetical to these objectives. *See Ratner v. Sioux National Gas Corp.,* 719 F.2d at 805. Qualitatively, punitive damages are not incompatible with the concept of liability without fault. Both seek to compensate or reward the victim who brings the offending enterprise to book, but under separate standards and separate concepts for separate purposes. A problem arises when the limits of future strict liability compensation cannot be forecast, as they cannot be in today's asbestos litigation. Then awards of compensation without regard to fault and punitive damage awards lose their homogeneity. Punitive damages should increase the victim's reward if conscious wrong accompanies the distribution of an offending product. However, in the virtually limitless damage milieu of asbestos litigation, punitive damages carry such a portent of overkill as to threaten future claimants rather than the enterprise with the burden of punishment awards to early victims. The general societal objectives of punishment—retribution and reformation—are adequately met in such a situation by the prospects of open-ended strict liability compensation that are as overwhelming as they are in this litigation.

The anticipation of multiple litigation for compensation damages serves in this instance as an effective deterrent to future illicit conduct. From a market-level perspective, the risk of non-deterrence is greatest where the manufacturer thinks it feasible to hold injury compensation losses to an amount that would still allow a profit on the defective item. This risk is especially great in situations where the potential injuries are so difficult to detect or so slight in relation to the burdens of instituting litigation that many injured persons would be likely to forego compensation claims. *See*

*Acosta v. Honda Motor Co.,* 717 F.2d 828, 838 (3d Cir.1983); Owen, Punitive Damages in Products Liability Litigation, 74 Mich.L. Rev. 1257, 1284–85 (1976). *See also Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 449–50 (1980). That is not the situation with respect to manufacturers of asbestos products, which products are now known to have the potential of inflicting grave injuries on unrestricted numbers of persons. No manufacturer could engage consciously in wrongdoing that would expose it to such overwhelming strict liability with any reasonable expectation of doing so profitably. On the contrary, the prospect of exposure to massive litigation in strict liability provides the impetus for manufacturers to take affirmative steps to ensure the safety of their products, since mere non-negligent behavior is no guarantee against strict liability.

The significance of punitive damages as a deterrent depends upon the size of the penalty increase relative to the "base penalty" exacted by strict liability compensatory awards. *See* F. Zimring & G. Hawkins, Deterrence 202 (1973). Because of the dimensionless character of the prospects for future litigation in this instance, the "base penalty," for all practical purposes, is illimitable. Correspondingly, the significance of punitive damages as a deterrent diminishes to the vanishing point.

Moreover, deterrence is an attenuated rationale with respect to these defendants. The defendants have long since begun to issue warnings about the safe use of their products. Johns-Manville states on brief that it ceased to manufacture the products here in issue over ten years ago.

We too "have the gravest difficulty in perceiving how claims for punitive damages can be so administered as to avoid overkill" in this situation. *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d at 839.

No alternatives suggested appear viable in these extraordinary circumstances. Some courts and commentators suggest

that overkill could be avoided by instructing the jury to consider the defendant's wealth and the probable effects of future compensatory and punitive damages awards or by other judicial control at the district court and appellate court level. *See Acosta v. Honda Motor Co.,* 717 F.2d at 838–39; *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357, 378 (E.D.Pa.1982); L. Frumer & M. Friedman, Products Liability § 36A.04 [2][a], at p. 10A-46 (1983); Seltzer, Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control, 52 Fordham L.Rev. 37, 58–60 (1983); Owen, Punitive Damages in Products Liability Litigation, 74 Mich.L.Rev. 1257, 1319–1325 (1976). In this case, such control would require unearthly prescience not only about the outcome of thousands of cases now pending against the defendants, but of thousands of claims certain to arise in the future. We perceive no meaningful criteria by which we could exercise judicial control to determine what is enough and what is too much. *See Roginsky,* 378 F.2d at 839. Likewise we perceive no criteria by which to set an arbitrary cap, either in the aggregate or for the individual suit, absent statutory guidance.

A single class action for recovery of one award of punitive damages might be an attractive alternative from a theoretical point of view, but does not appear feasible. Because the losses are so widespread and disparate, the vital legal issues would not be common to all plaintiffs, nor would the applicable legal standards be identical in all jurisdictions in which the cases would arise. *See Abed v. A.H. Robins Co.,* 693 F.2d 847, 850 (9th Cir.1982) (vacating certification of nationwide class action for punitive damages in Dalkon Shield IUD Products litigation); *Roginsky,* 378 F.2d at 839, n. 11. *See also In re Federal Skywalk Cases,* 93 F.R.D. 415, 419 (W.D.Mo.), *vacated,* 680 F.2d 1175 (8th Cir.), *cert. denied,* 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982).[28]

---

**28.** *But see* Seltzer, 52 Fordham L.Rev. at 61–92, advocating a mandatory class action for

punitive damages in mass tort litigation.

A final alternative, of course, would be to cling to the traditional remedy of punitive damages and let things run their course, indifferent to the disruption of the defendants' enterprises and to future claimants. One court has suggested that the demise of the manufacturer in such circumstances is not a "necessarily untenable" result. *Acosta v. Honda Motor Co.,* 717 F.2d at 838 n. 15 (3d Cir.1983). We do not share that belief. Retribution should not be effected at the expense of injured persons in need of a means of compensation for actual injuries, where retribution can be achieved effectively by ongoing liability for satisfaction of those needs.

Johns-Manville is currently in a reorganization proceeding under Chapter 11 of the Bankruptcy Code, *see In re Johns-Manville Corp.,* Nos. 82B 11,656 to 82B 11,676 (Bankr. S.D.N.Y. filed Aug. 26, 1982), alleged to be as a result of its potential tort liability arising from these suits. It might be argued that punitive damages pose no threat to the compensation of other Johns-Manville claimants, since the bankruptcy court could administratively manage punitive damage claims even to the point of denying such claims equal priority with claims for compensatory damages. *See* Note, Mass Tort Claims and the Corporate Tortfeasor: Bankruptcy Reorganization and Legislative Compensation Versus the Common-Law Tort System, 61 Texas L.Rev. 1297, 1322 (1983). The problem remains, however, of making provision for future claimants, whose numbers and the size of whose claims are purely speculative. Multiple present awards of punitive damages would only complicate the already formidable problems of devising a bankruptcy reorganization plan that would make adequate provision for future claimants.[29]

With respect to defendants that have not filed for bankruptcy, the argument that bankruptcy can alleviate the problems of inequitable compensation distribution posed by punitive damage awards proves too much. It is inappropriate for the court to hold out bankruptcy as a viable resolution of the problems arising from the invocation of judge-made rules in situations alien to those situations the rules were originally intended to address.

Pioneer plaintiffs do bear a disproportionate share of litigation expense and the hazard of litigation mistakes which later plaintiffs can avoid. To the extent that punitive damage awards can alleviate these detriments, they could be justified. However, the recovery of these costs through punitive damages for early litigators will set the trend for those who follow before funds of the enterprise are exhausted. Since the basis for punitive damage recovery is not bound to bear a relation to costs involved, this second group of victims can reap a benefit at the expense of those who recover nothing later. The same inequities and the same defeated goals keep it from being a

---

**29.** The bankruptcy court has ruled that the unprecedented, extraordinary nature of these proceedings mandated a declaration that future claimants are parties in interest, entitled to the appointment of an independent legal representative. The court cited a study commissioned by Johns-Manville which indicated that "a reasonable control projection of the number of lawsuits [against Johns-Manville] seen from 1982 on is likely to be about 45,000, with a reasonably firm lower bound of 30,000 and a very definitive upper bound on the order of 120,000." *In re Johns-Manville Corp.,* 36 B.R. 743, 746 (Bkrtcy.S.D.N.Y.1984) (Decision and Order on Keene's Motion to Appoint a Legal Representative). *Cf. In re UNR Industries, Inc.,* 725 F.2d 1111 (7th Cir.1984) (dismissing as premature appeal of federal district court's refusal to appoint representative for future claimants in asbestos manufacturer's bankruptcy proceeding).

The bankruptcy court also ruled that Johns-Manville did not act in bad faith in filing for Chapter 11 reorganization on the basis of the crushing economic burden it will bear over the next twenty to thirty years as a result of future claims of asbestos victims. The court determined that liquidation now would preclude present asbestos victims and future claimants from receiving just compensation. *In re Johns-Manville Corp.,* 36 B.R. 727 (Bkrtcy.S.D.N.Y. 1984) (Decision and Order on Motion to Dismiss Manville's Chapter 11 Petition).

For a discussion of problems associated with devising a reorganization plan for Johns-Manville, see Special Project, 36 Vand.L.Rev. at 828–30.

proper method of awarding costs to early litigants.

The disallowance of punitive damages in these extraordinary circumstances is not without difficulties. While societal objectives of punishment will be adequately met by multiple claims for compensatory damages, the plaintiff's individual objectives of punishment and reward go largely unsatisfied. The nature of the cause of action by which the plaintiff proceeds, however, influences the balance of societal and individual objectives of punishment. The individual objective of private retribution is outweighed by the broader societal objectives upon which the plaintiff's strict liability cause of action is predicated. The outcome of balancing policy considerations might not be the same if the plaintiff proceeded upon some other cause of action, such as negligence, predicated not on a societal objective of loss distribution but upon vindication of the plaintiff's individual legally protectible interests. That is not our case.

Some courts have questioned whether punitive damages are not inherently inconsistent with a strict liability cause of action in all circumstances, since strict liability is predicated only upon the defectiveness of the product and not upon the manufacturer's conduct. *See Gold v. Johns-Manville Sales Corp.,* 553 F.Supp. 482 (D.N.J.1982) (strict liability held incompatible with punitive damages); *Butcher v. Robertshaw Controls Co.,* 550 F.Supp. 692, 705 (D.Md.1981) (the two theories are incompatible); *Walbrun v. Berkel, Inc.,* 433 F.Supp. 384, 385 (E.D.Wis.1976). *See also* Sales, The Emergence of Punitive Damages in Product Liability Actions: A Further Assault on the Citadel, 14 St. Mary's L.J. 351 (1983). One federal appellate court has rejected this argument, noting that strict liability is intended to "expand recovery by circumventing the restrictions imposed by fault-based standards." *Acosta v. Honda Motor Co., Ltd.,* 717 F.2d 828, 835 (3d Cir.1983) (con-

struing Virgin Islands law). Under this view, strict liability does not preclude awards of punitive damages where the plaintiff does in fact show the requisite degree of fault. *Accord, Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357, 378 (E.D.Pa.1982); *Thomas v. American Cystoscope Makers, Inc.,* 414 F.Supp. 255, 264 n. 13 (E.D.Pa.1976) (dictum); *Racer v. Utterman,* 629 S.W.2d 387 (Mo.App.1981); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 446 (1980); L. Frumer & M. Friedman, Products Liability § 36A.02[1][b], at pp. 10A–12 through 10A–19; Special Project, 36 Vand.L.Rev. at 700–01; Owen, Punitive Damages in Product Liability Litigation, 74 Mich.L.Rev. at 1268–71. One appellate court has allowed punitive damages in strict liability asbestos litigation without explicitly addressing this issue. *See Moran v. Johns-Manville Sales Corp.,* 691 F.2d 811, 816–17 (6th Cir.1982) (construing Ohio law).

We do not reach the issue whether Mississippi would find punitive damages inherently incompatible with the theory of strict liability in all cases.[30] Our holding today is limited to the extraordinary circumstances of this litigation, where the allowance of punitive damages carries the manifest portent of undoing the strict liability remedy for present and prospective claimants and where the purposes of punitive damages are otherwise served.

We cannot predict, of course, whether other jurisdictions would subscribe to our approach in this litigation. From that perspective, our efforts to preserve the viability of strict liability compensation may be infected with an element of futility. The alternative, however, appears to be no solution at all, but mere resignation to defeat of the purposes of both strict liability and punitive damages. A fully satisfactory solution would require properly crafted federal legislation. Since that has not come to

---

**30.** In *Ashland Oil, Inc. v. Miller Oil Purchasing Co.,* 678 F.2d 1293, 1318–19 (5th Cir.1982), this court held that Mississippi would allow punitive damages in an action based on theories of strict liability, breach of warranty, negligence per se, and negligence. We did not reach the issue whether Mississippi would allow punitive damages in a pure strict liability cause of action.

pass, we must proceed with fundamental justice as our guide.

The disallowance of punitive damages in this situation expresses this court's central concern for the continued viability of the strict liability cause of action for present and future claimants. Where strict liability for compensatory damages imposes adequate punishment, as it does in this type of case, we decline to cleave to a judge-made remedy of punitive damages that would both fail in its own purpose and obstruct the broader objectives of the underlying cause of action which the plaintiff has chosen to pursue.

## VII. ADMISSIBILITY OF "SUMNER SIMPSON PAPERS"

Sumner Simpson was president of Raybestos-Manhattan from 1929 to 1948, and chairman of the board from 1945 until his death in 1953. A number of his personal papers remained in Raybestos-Manhattan's corporate vaults until brought to light in 1974. These so-called "Sumner Simpson papers" consisted largely of letters, memoranda, surveys, and articles dating from the 1930's and 1940's.

Jackson introduced into evidence three letters extracted from these papers. The first letter, dated September 25, 1935, from an editor of the newly created *Asbestos Magazine* to Mr. Simpson, proposed the publication of articles on British and American research on asbestosis. The other two letters, dated October 1, 1935, and October 3, 1935, are an interchange between Mr. Simpson and Mr. Vandiver Brown, attorney for Johns-Manville, questioning the desirability of publishing such information and the comparability of the British and American asbestos situations. (The texts of these three letters are included as an appendix to this opinion.)

■ The defendants argue that the trial court committed reversible error in admitting these letters, because they were relevant to no issue in the case, or if relevant,

their probity was outweighed by the risk of unfair prejudice. We agree.

These letters are of no probative value as to the foreseeability of the hazards associated with the finished products with which Jackson came in contact, as foreseeability relates to the defendants' duty to provide Jackson warning. The letters do not bear upon the safety of the finished products with which Jackson first came in contact in 1953, nearly two decades after the letters were written. The research that had been done at the time these letters were written was confined to plant employees, mine workers, and textile employees. None of the research concerned workers who were involved with the end use of finished asbestos products. As regards foreseeability of hazards to plant workers, the letters are inconclusive. They evidence a concern with the comparability of British plant conditions and American plant conditions, but do not evidence directly what the hazard in American plants was perceived to be.

Even if the letters were to some degree probative of foreseeability in 1935, that evidence would be highly remote, particularly in light of the research developments that occurred before Jackson commenced employment. In 1946, the Fleisher-Drinker report,[31] the first noteworthy epidemiological study of the risks of shipyard workers exposed to asbestos products, indicated that asbestos covering of naval vessels was relatively safe. This report was generally accepted until the famous Selikoff studies were published in 1965. *See* Special Project, 36 Vand.L.Rev. at 600–01. The relevant time frame in which foreseeability should be determined is that in which the products with which Jackson came into contact were distributed. The letters attempt inappropriately to fill the time gap from 1935 to 1953.

■ We do not suggest that the Fleisher-Drinker study forecloses establishing the foreseeability of the hazards of asbestos products at the time of the study or after-

---

**31.** *See* n. 4, *supra*.

wards. Foreseeability might well be established not only by other expert evidence,[32] but by proof of what the defendants themselves knew or should have known about the hazards associated with the use of their products. These particular 1935 letters are too remote in time and too attenuated in subject matter, however, to be probative in this connection.

Jackson argues that the letters are probative of the defendants' conspiracy to suppress information about the hazards of asbestos. Jackson has, however, abandoned that cause of action. Also, we have determined that Jackson is not entitled to an award of punitive damages in this case. Accordingly, the letters are not admissible to meet the requisite standard of conduct to support such an award.

Even if the letters were probative as to foreseeability, that probative value would be substantially outweighed by the danger of confusing these issues and misleading the jury, to the unfair prejudice of the defendants. *See* Fed.R.Evid. 403. There is a reasonable likelihood that a substantial right of the defendants was affected by the admission of these letters. Hence the error was not harmless. *See Johnson v. William C. Ellis & Sons Iron Works, Inc.,* 604 F.2d 950, 958 (5th Cir.1979).

Johns-Manville argues that it was prejudiced unfairly by the admission of numerous items of evidence apart from the letters discussed above. Johns-Manville does not attempt to identify every such item of evidence, but specifies numerous items that relate generally to establishing the defendants' knowledge of the hazards of asbestos from the 1930's until the 1960's. There is no point in ruling on this contention here. Upon retrial, this evidence, if offered, will be subject to the trial court's reconsideration of admissibility in light of our opinion today and in light of Federal Rules of Evidence 402 and 403.

## VIII. DISCLOSURE TO JURY OF SETTLEMENT AMOUNTS

The jury found Johns-Manville and Raybestos-Manhattan strictly liable for actual damages in the amount of $391,500. Previously, eight defendants had settled for a total of $45,750. The trial court informed the jury that other defendants had settled, but did not reveal the amounts of the settlements. The jury was instructed:

> You must disregard this fact [of prior settlements] and it should play no part in your deliberations herein. In assessing damages in this case, if any, you must not speculate or attempt to give credit by reason of any settlement or compromise between the plaintiff and any other defendant who is no longer in this case because this is a matter that the court will consider and make proper adjustments for at the proper time in the event that your verdict is for the plaintiff against any one or more or all of the defendants herein.

The trial court subsequently gave the defendants full credit for amounts paid in settlement and reduced the damages award to $345,750.

The defendants argue that the trial court erred in refusing their request to make full disclosure to the jury of the amounts of settlement. We disagree.

Under Mississippi law, a "joint tort-feasor is entitled to credit when another tortfeasor has settled or paid the injured party . . . ." *Wood v. Walley,* 352 So.2d 1083 (Miss.1977) (en banc). One method of giving credit is to disclose the amounts of settlement to the jury with instructions to credit the remaining defendants for that amount. *See Bogdahn v. Pascagoula Street Railway & Power Co.,* 118 Miss. 668, 79 So. 844 (1918) (affirming disclosure of settlement amounts).

The purpose of the Mississippi rule is to prevent double recovery. *Daves v. Reed,* 222 So.2d 411, 416 (Miss.1969). The district court accomplished this purpose by deduct-

---

**32.** For purposes of determining the foreseeability requirement in strict liability for failure to warn, the manufacturer is held to the knowl-

edge and skill of an expert in the field. *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d at 1089.

ing the amount of the settlements from the jury's award. The jury could have been misled and confused by settlement amounts for atypical minor claims. If the court had let in the amounts of the settlements, it would have been fairly obliged to explain to the jury the nature of the claims, how they compared with the claims here, and other factors too complicated to make such a comparison practicable. The disclosure of the fact of the settlements without amounts prejudiced no one, since the jury may have speculated whether settlement amounts were high or low.

## IX. CONCLUSION

We AFFIRM the district court's holding that Jackson is entitled to a strict tort liability cause of action against the defendants and the district court's treatment of settlement amounts; we REVERSE on the admissibility of cancer evidence and of the "Sumner Simpson papers," and on the allowance of punitive damages; and we REMAND this case to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

## APPENDIX

"A S B E S T O S"

Published by

SECRETARIAL SERVICE

16th Floor, Inquirer Bldg.

Philadelphia, PA., U.S.A.

September 25, 1935.

Mr. Sumner Simpson, President,
Raybestos-Manhattan, Inc.,
Bridgeport, Conn.

Dear Sir:

You may recall that we have written you on several occasions concerning the publishing of information, or discussion of, asbestosis and the work which has been, and is being done, to eliminate or at least reduce it.

Always you have requested that for certain obvious reasons we publish nothing, and, naturally your wishes have been respected.

Possibly by this time, however, the reasons for your objection to publicity on this subject have been eliminated, and if so, we would like very much to review the whole matter in "ASBESTOS".

Our thought is that we could either prepare from data which we have in our files, or obtain from Mr. W.A. Godfrey of the Cape Asbestos Company, London, who is much interested in the subject, an article on the work done in England and then follow it with an article written by someone in your organization, as to the work done here.

We understand from Mr. Stover that your North Charleston plant, contains very complete dust control equipment and a description of such equipment, if you approve, would make a very interesting part of the article. Possibly even you could supply a photograph or two showing some part of this dust control equipment.

We await with much interest your reply. If there is no serious objection it would seem to be a most interesting subject for the pages of "ASBESTOS", and possibly a discussion of it in "ASBESTOS" along the right lines, would serve to combat some of the rather undesirable publicity given to it in current newspapers.

Very truly yours,
"A S B E S T O S
s/A.F. Rossiter
A.F. Rossiter
Bridgeport, Conn.
Oct. 1, 1935

Mr. Vandiver Brown, Attorney
Johns-Manville Corp.,
22 East 40th St.,
New York City.

My dear Mr. Brown:

Enclosed is copy of a letter received from Miss Rossiter, of "Asbestos."

As I see it personally, we would be just as well off to say nothing about it until our survey is complete. I think the less said about asbestos, the better off we are, but at the same time, we cannot lose track of the fact that there have been a number of articles on asbestos dust control and asbestosis in the British trade magazines. The magazine "Asbestos" is in business to publish articles affecting the trade and they have been very decent about not re-printing the English articles.

I shall be pleased to have your opinion in the matter.

Very truly yours,

President

SS–G

Enc.

\*   \*   \*   \*   \*   \*

JOHNS–MANVILLE

Twenty-Two East Fortieth Street

New York, N.Y.

October 3, 1935

Mr. S. Simpson, President,
Raybestos-Manhattan, Inc.,
Bridgeport, Conn.

My dear Mr. Simpson:

I wish to acknowledge receipt of yours of October 1st enclosing copy of the September 25th letter from the editor of the magazine "ASBESTOS". I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity. Even if we should eventually decide to raise no objection to the publication of an article on asbestosis in the magazine in question, I think we should warn the editors to use American data on the subject rather than English. Dr. Lanza has frequently remarked, to me personally and in some of his papers, that the clinical picture presented in North American localities where there is an asbestos dust hazard is considerably milder than that reported in England and South Africa.

I believe the question raised by Miss Rossiter might well be considered at the committee meeting scheduled for next Tuesday, at which I understand both you and Mr. Judd will be present.

Very truly yours,

s/ Vandiver Brown

Vandiver Brown

Attorney

VB: T

ON PETITIONS FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM and DAVIS, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.